Trey D. Brown (SBN 314469)
In-House Counsel
Strike 3 Holdings, LLC
11271 Ventura Blvd., Ste. 717
Los Angeles, CA 91604
Telephone:    (323) 347-4271
Email:        trey@strike3holdings.com

Christian W. Waugh (FL SBN 71093)
*(pro hac vice application pending)*
WAUGH PLLC
201 E. Pine Street, Ste. 315
Orlando, FL 32801
Telephone:    (321) 800-6008
Email:        cwaugh@waugh.legal

Jeremy J. Thompson (MN SBN 402173)
*(pro hac vice application pending)*
The Law Office of Jeremy J. Thompson PLLC
5200 Wilson Road, Ste. 150
Edina, MN 55424
Telephone:    (952) 952-1883
Email:        jeremy@jthompson.law

*Attorneys for Plaintiffs*
STRIKE 3 HOLDINGS, LLC
COUNTERLIFE MEDIA, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware limited liability company, and COUNTERLIFE MEDIA, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>Defendant. | Case Number:<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT - DEMAND FOR JURY TRIAL** |

Plaintiffs, Strike 3 Holdings, LLC ("Strike 3" or "Plaintiff"), and Counterlife Media,

LLC ("Counterlife" or "Plaintiff") (collectively, "Plaintiffs") bring this complaint against

1

Defendant, Meta Platforms, Inc. ("Meta" or "Defendant"), and allege as follows:

**Introduction**

1. This is a case about the ongoing, wholesale copyright infringement of Plaintiffs' motion pictures by Defendant.

2. Plaintiffs are the owners of award-winning, critically acclaimed adult motion pictures ("Works").

3. Strike 3's Works are distributed through the *Blacked*, *Tushy*, *Vixen*, *Tushy Raw*, *Blacked Raw*, *Milfy*, *Wifey*, and *Slayed* adult content websites. Counterlife's Works are distributed through the *Deeper* website. Strike 3 has a majority ownership interest in Counterlife, and all brands are together distributed through Vixen Plus, an online media streaming platform.

4. The brands are famous for redefining adult content with Hollywood style and quality, resulting in over 25 million unique monthly visitors to the above websites.

5. Defendant is infringing these works on a grand scale. Using the BitTorrent protocol, Defendant is committing rampant copyright infringement by both downloading Plaintiffs' Works as well as engaging in methodical and persistent distribution of those Works to others. Defendant has continuously infringed Plaintiffs' Works for years, often infringing the very same day the motion pictures are released.

6. Since 2018, Defendant has infringed at least 2,396 movies owned by Plaintiffs.

7. Defendant's infringement is intentional. Defendant downloaded Plaintiffs' Works from pirate sources for purposes of acquiring content to train its Meta Movie Gen, Large Language Model ("LLaMA"), as well as various other Meta AI Models that rely on video training content.

8. Defendant also distributes Plaintiffs' content on BitTorrent in order to capitalize on the reciprocal, "tit-for-tat" mechanism embedded within the BitTorrent Protocol. Due to the popularity of Plaintiffs' content within BitTorrrent, Defendant has specifically targeted Plaintiffs' Works for distribution as currency to support its downloading of a vast array of other content necessary to train its AI models.

2

9.    Defendant distributed Plaintiffs' Works long after it received a full copy of Plaintiffs' motion picture files from BitTorrent, sometimes for days, weeks, or even months.

10.    This is a civil action seeking damages under the United States Copyright Act of 1976, *as amended*, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act").

### Jurisdiction and Venue

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338 (jurisdiction over copyright actions).

12.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this State.  Additionally, Defendant used Internet Protocol addresses ("IP addresses") it owns which are registered to a physical address located at its principal place of business within this District to commit copyright infringement.  Therefore, Defendant committed the tortious conduct alleged in this Complaint in this State and Defendant has engaged in substantial – and not isolated – business activity in this State.

13.    Pursuant to 28 U.S.C. §§ 1391(b) and (c), venue is proper in this district because: (i) a substantial part of the events or omissions giving rise to the claims occurred in this District; and (ii) Defendant maintains its principal place of business in this District and State. Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases) because Defendant or Defendant's agents reside or may be found in this District.

14.    Under Civil Local Rule 3.2(d), assignment of this case to the San Francisco Division is proper because Meta is headquartered in San Mateo County, where a substantial part of the events giving rise to Plaintiffs' claims occurred and the interstate trade and commerce involved and affected by Defendant's conduct giving rise to the claims herein occurred in this Division.

### Parties

15.    Strike 3 is a Delaware limited liability company located at 2140 S. Dupont Hwy, Camden, DE with its principal place of business in Los Angeles, CA.

16.    Counterlife is also a Delaware limited liability company located at 2140 S. Dupont Hwy, Camden, DE with its principal place of business in Los Angeles, CA.

3

17.     Meta is a Delaware corporation with its principal place of business located at 1 Meta Way, Menlo Park, CA.

### Agents and Co-Conspirators

18.     Meta's infringement was authorized, ordered, or performed by its respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of Meta's businesses and affairs. Meta's agents operated under the explicit and apparent authority of Meta's principals. Meta and its subsidiaries, affiliates, employees, contractors, and agents operated as a single unified entity.

19.     On information and belief, Meta engaged various companies, individuals, or firms to participate as co-conspirators in the infringement of Plaintiffs' Works and these co-conspirators have performed acts and made statements in furtherance of the infringement. Each acted as a principal, agent, or joint venture on behalf of Meta with respect to the acts, violations, and common course of conduct alleged herein.

### Factual Background

### *Plaintiffs' Award-Winning Copyrights*

20.     Plaintiffs' subscription-based websites proudly host a paid subscriber base that is one of the highest in the adult industry. Plaintiffs also license their motion pictures to popular broadcasters. Additionally, Plaintiffs' motion pictures are distributed as DVDs garnering some of the highest sales within its niche in the United States.

21.     Plaintiffs' philosophy has always been to create high-end, sophisticated adult content.  Plaintiffs have adopted a business model seeking to treat their employees and performers with respect along with offering some of the highest pay rates for actresses and actors in the industry. Plaintiffs believed that making these investments would result in superior content generating a widespread and loyal fan base.

22.     Unlike the majority of producers within this niche, Plaintiffs have made significant investments in expensive, Hollywood grade equipment including cameras, lighting, and sound. All of their movies are filmed in 4KHD with award-winning directors and performers with shoots often done at exotic and expensive locations.

23.     To achieve their goal of producing high-end motion pictures, Plaintiffs have also invested in their employees. To date, Plaintiffs employ over 100 people in offices around the world.  The people who work for Plaintiffs include writers, directors, producers, editors, cinematographers, as well as casting, creative, and marketing professionals. Several of Plaintiffs' employees have been inducted into the AVN Hall of Fame which commemorates those who have achieved great success working in the adult industry for at least a decade. Rolling Stone magazine has even profiled the people who work for Plaintiffs.[1]

24.     Plaintiffs also employ a wide array of traditional staff with roles necessary for any successful business.  These include accountants, lawyers, human resources managers, and sophisticated tech teams who ensure their movies can be delivered seamlessly in multiple formats. Plaintiffs also make significant investments to keep their operations on the cutting edge by employing business growth and PhD level data science professionals who are supported by state-of-the-art software.

25.     In doing so, Plaintiffs provide competitive, reliable salaries, health care, 401K, and a multitude of other benefits designed to ensure they exist as a competitive and positive workforce.

26.     No other company in the adult industry comes close to maintaining the same level of seasoned, creative, accomplished, and professional talent as Plaintiffs do.

27.     Plaintiffs also dedicate significant expense and resources to ensure their professional adult film actresses and actors receive among the highest pay rates in the industry.

28.     Plaintiffs ensure safety on their film sets and a comfortable, creative, and exciting environment. They have been recognized for creating feminist, ethical porn.[2]

29.     Not surprisingly, Plaintiffs' motion pictures and brands have won many awards.

30.     A sample of some of the recent awards Plaintiffs' have won include:

---

[1] Jennifer Swan, *Versace, Champagne and Gold: Meet the Director Turning Porn into High Art*, ROLLING STONE (Apr. 5, 2018), https://www.rollingstone.com/culture/culture-features/versace-champagne-and-gold-meet-the-director-turning-porn-into-high-art-629908/.
[2] Emma Glassman-Hughes, *Here's Your Ultimate Guide to Feminist, Ethical Porn (You're Welcome)*, ELITE DAILY (Feb. 20, 2024), https://www.elitedaily.com/dating/what-is-feminist-porn-where-to-watch.

a.  Best Actress – Featurette, Maitland Ward for *Deeper* (AVN, 2025)
b.  Best All Girl Movie or Collected Release – *Slayed* (AVN, 2025)
c.  Best Anthology Series – Club VXN (AVN, 2025)
d.  Best Director – International (AVN, 2025)
e.  Best Director – Narrative – Kayden Kross (AVN, 2025)
f.  Best Editing – American MILF (AVN, 2025)
g.  Best Outstanding Comedy – American MILF (AVN, 2025), (XBIZ, 2025)
h.  Best Vignette Series – *BlackedRaw* (XBIZ, 2025)
i.  Director of the Year – Derek Dozer (XBIZ, 2025)
j.  Best Acting – Lead - Maitland Ward, American MILF (XBIZ, 2025)
k.  Other awards in the past have included: "Studio of the Year" (XBIZ), "Global Brand of the Year" (AVN), "Best Marketing Campaign – Company Image" (AVN), "Best Cinematography" (AVN), "Best Production Company" (XRCO), "Mainstream Venture of the Year" (for a collaboration on music videos with famed rapper G-Eazy) (AVN) and "Best Membership Website" (AVN), "Best Paid Site" (Askmen.com).

31.    Plaintiffs' movies have even been advertised on billboards in Hollywood.[3]

32.    Plaintiffs are also known for innovation. Just this year, Strike 3 launched its latest brand *Wifey*,[4] which combines the concepts of reality television and adult content. *Wifey* has gained enormous worldwide attention, even prompting discussion on The View.[5]

33.    Unfortunately, Plaintiffs have a major problem with Internet piracy.  Plaintiffs' Works are often within the most infringed files on BitTorrent websites.  Arguably, Plaintiffs' movies are among the most pirated entertainment content in the world.

### Meta Is in the Business of Developing AI Applications and Technologies

34.    Meta is a multinational technology company that owns and operates several social media platforms including Facebook, Instagram, and WhatsApp.

35.    It was originally established in 2004 as "TheFacebook, Inc."  In 2021, it rebranded as Meta Platforms, Inc. demonstrating its commitment to expand beyond social media and develop virtual and augmented reality technologies ("VR" and "AR" respectively) as well as AI platforms and technologies.

36.    Currently, Meta is a publicly traded NASDAQ 100 company with a market capitalization of in excess of $1.75 trillion.

---

[3] Maitland Ward, *The Women Behind That History-Making Porn Billboard in Hollywood*, DAILY BEAST (Nov. 13 2021 12:20AM EST),  https://www.thedailybeast.com/whats-behind-that-history-making-porn-billboard-in-hollywood/.
[4]    WIFEY, https://wifey.vmg.studio/.
[5]    The View, *How Is 'Hotwifing' Trend Saving Marriages?*, YOUTUBE (Apr. 4, 2025), https://www.youtube.com/watch?v=sMW2jnglCM8.

6

37.    Meta began developing research into AI in 2013, with the launch of Facebook Artificial Intelligence Research ("FAIR").  Its initial goal was to research data science, machine learning, and artificial intelligence.

38.    Meta began using videos to train its AI platforms sometime in 2018.

39.    In 2019, it released SlowFast networks designed specifically for action recognition in videos. Meta expanded efforts in video-text alignment, audio-visual fusion, and temporal modeling.

40.    In October 2021, Meta officially launched the Ego4D initiative.  This was a global effort to collect egocentric, first-person video to fuel next-gen models for virtual and augmented realities. Mark Zuckerberg, Meta's CEO, tied this launch directly to Meta's metaverse vision. Meta then intensified its research into real-world tasks like episodic memory, hand-object interaction, and video question answering.

41.    In 2022, it began researching Multimodal Models and Generative Video and released ImageBind, a model trained to align multiple modalities including video, audio, and text. Meta also began research into Make-A-Video, Meta's first major text-to-video generation model.

42.    From 2023 to 2024, Meta continued its AI research and focused on foundation models and generative AI.  It enhanced its efforts to create foundation models that learn from video, image, text, and audio simultaneously. Meta began to incorporate multimodal embeddings for use in AR, VR, and AI assistants.

43.    It also invested in models that power video understanding in Ray-Ban Meta smart glasses, AI avatars, and assistants.

44.    Meta has recently invested a purported $3.5 billion to acquire a significant stake in EssilorLuxottica, the maker of Ray-Ban glasses.

45.    In 2024, Meta released Movie Gen, a "suite of AI models that show how you can use simple text inputs to produce custom videos and sounds, edit existing videos, and transform

your personal image into a unique video."[6]

46.    Movie Gen models generate high-quality, 1080p HD video with corresponding audio tracks. MovieGen is trained on "internet scale image, video, and audio data."

47.    According to Meta's website, "[g]enerative AI models take a large amount of data to effectively train, so a combination of sources are used for training, including information that's publicly available online, licensed data and information from Meta's products and services."[7]

48.    However, Meta does not identify what "publicly available online" data it used.

49.    Just recently, Meta released V-JEPA 2, a powerful self-supervised video world model for understanding, predicting and planning in physical environments. V-JEPA 2 trained on over 1 million hours of "Internet video." Meta has not specified what it identifies as "Internet video."[8]

50.    Meta also recently released LLaMA 4, the first version of LLaMA to incorporate video training. LLaMA 4 is a multimodal large language model ("LLM") that analyzes and understands text, images and video data. LLaMA also supports multiple languages from all parts of the globe.

51.    LLaMA 4 is an open-source technology, enabling others to further develop and use the technology for multiple AI developmental uses.

52.    Meta has not disclosed what exact training data was used for LLaMA 4, however, its website hints that it may be "biased" because of "training data available on the Internet."[9]

### Plaintiffs Discovered Meta Torrenting its Movies through its Corporate IPs

53.    Recently, Meta admitted to using hundreds of thousands of pirated books it

---

[6] *Partnering with Blumhouse, creators, and the entertainment industry as we develop Meta Movie Gen*, META (Oc. 17, 2024), https://ai.meta.com/blog/movie-gen-video-sound-generation-blumhouse/.

[7] Mike Clark, *Privacy Matters: Meta's Generative AI Features,* META  (Sep. 27, 2023), https://about.fb.com/news/2023/09/privacy-matters-metas-generative-ai-features/.

[8] *Introducing V-JEPA 2: A self-supervised foundation world model*, META, https://ai.meta.com/vjepa/ (last visited Jul. 17, 2025).

[9] *The Llama 4 herd: The beginning of a new era of natively multimodal AI innovation*, META (Apr. 5, 2025), https://ai.meta.com/blog/llama-4-multimodal-intelligence/.

obtained through BitTorrent to train its LLaMA platforms in a separate lawsuit, *Kadrey v. Meta Platforms, Inc*. filed on July 7, 2023. No. 23-3417, D.E. 1 (N.D. Cal.) [hereinafter *Kadrey*].

54.    Internal documents and court filings revealed that Meta employees and agents downloaded over 81.7 terabytes of pirated books and academic papers using BitTorrent protocols.

55.    The lawsuit received a large amount of press coverage.  Around January 2025, Plaintiffs became aware of Meta's infringement activity on BitTorrent through such coverage.

56.    Upon learning of Meta's use, Plaintiffs researched its archive of recorded infringement captured by its VXN Scan and Cross Reference tools, discussed *infra*, and found forty-seven IP addresses identified as owned by Facebook infringing its copyright protected Works.  *See* Exhibit A.

57.    Each IP address listed on Exhibit A shows the earliest recorded infringement of Plaintiffs' works from that IP Address. Many of the IP addresses listed on Exhibit A continued unauthorized distribution of multiple other Works owned by Plaintiffs over several years.

58.    Plaintiffs confirmed each IP address enumerated in Exhibit A belonged to Meta by utilizing IP address geolocation technology by Maxmind Inc. ("Maxmind").

59.    Maxmind is an industry-leading provider of IP address intelligence and online fraud detection tools. Over 5,000 companies, along with United States federal and state law enforcement, use Maxmind's GeoIP data to locate Internet visitors, perform analytics, enforce digital rights, and efficiently route Internet traffic.

60.    An example of Maxmind's records show that IP address 185.89.216.251 is registered to "Facebook" as a corporate IP address.



***The BitTorrent File Distribution***

***Network is Used to Infringe Plaintiffs' Copyrights***

61.    BitTorrent is a system designed to quickly distribute large files over the Internet. Instead of downloading a file, such as a movie, from a single source, BitTorrent users are able to connect to the computers of other BitTorrent users in order to simultaneously download and upload pieces of the file from and to other users.

62.    BitTorrent's popularity stems from the ability of users to directly interact with each other to distribute a large file without creating a heavy load on any individual source computer and/or network.  It enables Plaintiffs' motion pictures to be transferred quickly and efficiently.

63.     To share a movie within the BitTorrent network, a user first uses BitTorrent software to create a .torrent file from the original digital media file.  This process breaks the original digital media file down into numerous pieces.

64.    The entire movie file being shared has a hash value (i.e. the "File Hash"). A hash value is an alpha-numeric value of a fixed length that uniquely identifies data.

65.    Hash values are not arbitrarily assigned to data merely for identification

Complaint – Demand for Jury Trial

purposes, but rather are the product of a cryptographic algorithm applied to the data itself. As such, while two identical sets of data will produce the same cryptographic hash value, any change to the underlying data – no matter how small – will change the cryptographic hash value that correlates to it.

66.     To find and re-assemble the pieces of the digital media file, i.e., to download the file using BitTorrent, a user must obtain the .torrent file for the specific file that has been broken down into pieces.

67.     Each .torrent file contains important metadata with respect to the pieces of the file. When this data is put into the cryptographic algorithm, it results in a hash value called the "Info Hash."

68.     The "Info Hash" is the data that the BitTorrent protocol uses to identify and locate the other pieces of the desired file (in this case, the desired file is the respective file for the infringing motion pictures that are the subject of this action) across the BitTorrent network.

69.     Using the Info Hash in the metadata of a .torrent file, a user may collect all the pieces of the digital media file that correlates with the specific .torrent file.

70.     Once a user downloads all of the pieces of that digital media file from other BitTorrent users, the digital media file is automatically reassembled into its original form, ready for playing.

71.     Strike 3 has developed, owns, and operates infringement detection systems named "VXN Scan" and the "Cross Reference Tool." Each infringement detection system identifies infringement in two distinct ways.

72.     The Cross Reference Tool first searched for and obtained .torrent files claiming to be infringing copies of Plaintiffs' works, and then VXN Scan downloaded complete copies of the digital media files that correlate to those .torrent files.

73.     Plaintiffs then compared the completed digital media files to Plaintiffs' copyright protected works to determine whether they are infringing copies of one of Plaintiffs' copyrighted works.

74.     The digital media files have been verified to contain a digital copy of a motion

picture that is identical (or, alternatively, strikingly similar or substantially similar) to Plaintiffs' corresponding copyrighted Works.

75.     VXN Scan used the "Info Hash" value, contained within the metadata of the .torrent file which correlated with a digital media file that was determined to be identical (or substantially similar) to a copyrighted work, to download a piece (or pieces) of multiple digital media files from Meta using the BitTorrent network.

76.     VXN Scan only downloads pieces of digital media files from Plaintiffs' copyrighted works. At no point did VXN Scan upload content to any BitTorrent user.  Indeed, it is incapable of doing so.

77.     While Defendant was using the BitTorrent file distribution network, VXN Scan established multiple direct Transmission Control Protocol/Internet Protocol ("TCP/IP") connections with Defendant's IP addresses.

78.     Plaintiffs identified these pieces as portions of infringing copies of Plaintiffs' motion pictures.

79.     The VXN Scan detected, captured and documented Defendant transmitting pieces of Plaintiffs' copyrighted motion pictures and recorded those transactions in Packet Capture ("PCAP") files.

80.     Plaintiffs have documented with PCAP evidence well over 100,000 unauthorized distribution transactions of Plaintiffs' Works by Defendant.

81.     Plaintiffs also recorded Defendant's activity on BitTorrent using its Cross Reference Tool.

82.     The Cross Reference Tool is designed on the basis of a distributed hash table ("DHT") that is a class of decentralized distributed systems that provides an identification service similar to a hash table: (key, value) pairs are stored in a DHT, and any participating node can efficiently retrieve the value associated with a given key.

83.     BitTorrent clients use a DHT to locate peers who are participating in the distribution of the digital media files related to the Info Hash. Specifically, a BitTorrent client locates and connects to the DHT network. That way it registers its own IP address while

requesting IP addresses of other peers, which are distributing the same .torrent file.

84.     Using this process BitTorrent users are able to locate and connect to a number of peers within a particular swarm, and download the data related to each .torrent file.

85.     A BitTorrent client registers the IP address of the user into the DHT with the purpose of participating in the distribution of constituent pieces of the relevant digital media file.

86.     The Cross Reference Tool uses servers that locate .torrent files and their related Info Hashes. The servers subsequently download the torrent information from popular torrent websites. The Cross Reference Tool is incapable of downloading any digital media file associated with an Info Hash, and it only has the ability to download torrent file metadata.

87.     Similar to BitTorrent clients, the Cross Reference Tool uses a DHT to obtain the IP Addresses of peers registered to each .torrent file listed in the DHT.

88.     The Cross Reference Tool detected and documented that Defendant used the BitTorrent File Distribution Network with the purpose of distributing digital media files that have been determined to be identical (or substantially similar) to Plaintiffs' Works.

89.     At no point did the Cross Reference Tool upload content to any BitTorrent user. As with VXN Scan, it is incapable of doing so.

### *Strike 3 Discovered Meta Using Hidden*
### *Data Centers to Further Infringe Its Works*

90.     The *Kadrey* lawsuit also revealed that Meta used what it described as "off-infra" IP addresses to conduct its infringement so that it could conceal its BitTorrent activities. *See*, *e.g.*, *Kadrey*, D.E. 562-13, at p3 ("Meta employees indicated they wanted to keep torrenting activity off of Meta infrastructure so that seeders could not be traced back to Meta IP addresses."); D.E. 568-3, D.E. 479-1, D.E. 417-1, D.E. 408-1.

91.     One employee specifically stated, "not sure we can use Meta's IPs to load through torrents pirate[sic] content, ahah." *Id*. D.E. 567-50, at p1.

92.     Meta's employees testified that Meta configured six Virtual Private Clouds ("VPCs") to torrent content. *Id.* D.E. 490-37, at p3.

93.     Strike 3's Cross Reference Tool not only captures evidence of Plaintiffs' Works being infringed, but it also captures evidence of other activity on the BitTorrent network including ebooks, movies, television shows, music, and software.

94.     Strike 3 conducted an analysis attempting to find Meta's hidden IP addresses by looking for certain correlations to data patterns that matched infringement patterns seen on Meta's corporate IP Addresses. These include, but are not limited to, such instances as:

   a.  Similar patterns involving mass infringement beyond what a human could consume;
   b.  Similar methodical downloads of disparate content based on the patterns shown by Meta's corporate IP addresses;
   c.  Similar content being downloaded on the same day or at or near the same time as on Meta's corporate IP addresses;
   d.  Similar targeting of certain types of content featuring specific languages at or around the same date and time that followed a shifting pattern (i.e. IP addresses that targeted French language versions of TV shows or films on the same day as Meta's corporate IP addresses and then shifted in apparent connection with Meta's corporate IP addresses to target Russian language versions of TV shows); and
   e.  Correlations to Meta's corporate IP addresses where the same content is being torrented in different resolutions at or around the same time.

95.     Exhibit B highlights two years of this analysis.

96.     Exhibit C mirrors Exhibit B but contains the full raw file data.[10]

97.     Meta's IP addresses are acting in conjunction with the IP addresses outlined in these exhibits. These IP addresses include ones which reside in seven ranges (A–G) along with a Comcast residential IP address:

```
IP Range A    102.129.234.0 – 102.129.234.255
IP Range B    102.129.235.0 – 102.129.235.255
IP Range C    102.129.255.0 – 102.129.255.255
IP Range D    102.129.154.0 – 102.129.154.255
IP Range E    102.129.164.0 – 102.129.164.255
IP Range F    102.129.252.0 – 102.129.252.255
IP Range G    45.45.152.0   – 45.45.155.255
Residence #1          76.132.71.116
```

98.     Upon information and belief, Ranges A–F are (or were at the time of infringement) installed on six different servers managed by a major third-party datacenter

---

[10] Because Exhibit B and Exhibit C detail infringement of works owned by other rights holders, Plaintiffs have filed these exhibits under seal.

provider. Upon information and belief, these servers are the six VPCs referenced in the *Kadrey* lawsuit.

99.    Range G is owned by VDS Corp, LLC, a non-profit registered with the State of Hawaii listing its main address as 2138 Randall Dr. Honolulu, Hawaii 96815.

100.    Plaintiffs' investigation has not been able to locate this street address nor find any public information related to this entity's purported Director.

101.    These correlations show IP addresses in these seven ranges are clearly operating in conjunction with Meta's corporate IP addresses all of which are being centrally driven by sophisticated algorithms and scripts.

102.    These correlations also quantify that both the "off-infra" as well as the Meta Corporate IP addresses act consistently in non-human patterns and that the acquisition of this content is for AI training data and not for personal use.

### Strike 3 Discovered At Least One Meta
### Employee Infringing Through a Home Residential IP

103.    Strike 3 has identified through its anti-piracy litigation the subscriber in control of Comcast IP address 76.132.71.116 which was identified (per Exhibit B) to be infringing on BitTorrent in conjunction with both Meta corporate IPs as well as the stealth IP Addresses.

104.    [REDACTED]

105.    [REDACTED]

106.    [REDACTED]

107.    [REDACTED]

### Meta Infringed Plaintiffs' Works Using BitTorrent

108.    Meta infringed 2,396 of Plaintiffs' Works.  All of these Works have been registered with the United States Copyright Office. These Works, including the website of publication, date of publication, registration date and Registration Number with the United States Copyright Office are outlined on Exhibit D.

109.    Exhibit E contains an infringing transaction for each Work present on Exhibit D. As illustrated on this exhibit, 157 of these motion pictures were infringed by IP Addresses

directly owned by Meta.

110. Defendant infringed Plaintiffs' Works multiple times from multiple locations. Exhibit F outlines each Work infringed on Exhibit D showing Defendant infringed from its corporate owned IP Addresses, IP Addresses located on stealth data center servers and at least one residential IP address of a Meta employee.

### Meta Intentionally and Willfully Distributed

### Plaintiffs' Works for Its Own Commercial Benefit

111. Meta specifically targeted Plaintiffs' content for distribution in order to accelerate its downloads of vast amounts of other content.

112. BitTorrent operates on a "tit for tat" basis where Meta's seeding (uploading), enables Meta to obtain better download speeds so that it can consume more content, faster.

113. The tit-for-tat mechanism within the BitTorrent Protocol rewards users who distribute the most desired content. This ensures that users distribute content on BitTorrent as opposed to solely downloading. If all BitTorrent users were to avoid distribution, then there would be no content available on the network for users desiring to download it.

114. Defendant was specifically aware of this issue and, discovery will likely show, is the reason why Defendant elected to continuously distribute Plaintiffs' content as opposed to just purchasing a subscription or modifying its BitTorrent clients to download only.

115. In the *Kadrey* lawsuit, Meta testified that it wrote a script to intentionally limit distributing popular books on BitTorrent. *Kadrey,* D.E. 568-2, at p3–6 ("Rebuttal Expert Report of Barbara Frederickson-Cross").

116. However, Defendant remained in swarms distributing Plaintiffs' content long after acquiring a full copy for training. *See* Exhibit G (outlining Defendant's continuous distribution of 1,335 of Plaintiffs' movies for at least three full days after acquiring the full copy of the movie for training purposes).

117. The only reason to incur the server and bandwidth expense of remaining in a swarm for these long durations is to leverage the extended distribution as tit-for-tat currency in order to efficiently download millions of other files from BitTorrent.

118.    Although Meta may have intentionally limited seeding of large amounts of content it sourced from BitTorrent, Meta hand-picked Plaintiffs' Works for intense periods of distribution.

119.    There are many such periods. Exhibit H illustrates five episodes where a specific site operated by Plaintiffs was targeted for distribution.

120.    Defendant often infringed Plaintiffs' Works shortly after publication, and the infringement continued for extended durations. Exhibit I enumerates each Work distributed along with its publication date, earliest detected distribution by Defendant, and the most recent unauthorized distribution of the Work by the Defendant.

121.    Defendant illegally sacrificed Plaintiffs' copyrights into the swarm for Meta's corporate gain.

122.    Meta's unauthorized distribution causes serious harm to Plaintiffs. Meta's distribution not only enables others to take Plaintiffs' content for free, but it also bypasses important federal and state legislation designed to ensure safe distribution of adult content.

123.    For example, age verification laws exist in over two dozen states. Meta's distribution of Plaintiffs' content bypasses age verification safeguards and allows for anyone capable of using BitTorrent, including minors, to access it.

124.    Plaintiffs have devoted significant resources to complying with state and federal laws regulating the adult industry. Plaintiffs cannot compete against Meta when it ignores federal and state laws and offers Plaintiffs' works for free.

125.    Meta is also damaging Plaintiffs' hard-earned reputations as respected and ethical sources for high-quality adult motion pictures by potentially allowing minors unfettered to access Plaintiffs' content against Plaintiffs' consent.

126.    Meta's willful infringement was for commercial use, with expected profits to generate between "$460 billion to $1.4 trillion of total revenue by 2035." *See Kadrey*, D.E. 574.

127.    Just recently, Mr. Zuckerberg announced an intent to spend "hundreds of billions of dollars . . . to build superintelligence" including through huge AI data centers in the United

States. One of the sites is expected to cover an area the size of Manhattan.[11]

128.    Meta has also reinvested in its talent pool, in some cases offering up to $100 million dollars to AI researchers to work for them.[12]

129.    Meta made the deliberate choice to seed Plaintiffs' motion pictures in order to capitalize on faster download speeds so it could infringe other content faster. Despite Meta's enormous capital and opportunity for profits, it still chose to use Plaintiffs' Works without license or authorization, to download massive amounts of content through the BitTorrent network.

130.    Plaintiffs did not authorize Meta to distribute its motion pictures through the BitTorrent network.

131.    Indeed, even *after* Plaintiffs notified Meta's attorneys that it was infringing Plaintiffs' Works (including providing forensic evidence and asking Meta to cease), Meta's infringement continued and continues to this day.

### *Meta Intentionally Targeted Plaintiffs' Works for AI Training*

132.    On information and belief, Meta is also using Plaintiffs' content to train its AI Models, knowing that such models will eventually create identical content for little to no cost. This will effectively eliminate Plaintiffs' future ability to compete in the marketplace.

133.    Based on the scale of infringement recorded by VXN Scan and the Cross Reference Tool, no human being has the capacity to download and consume as much content as Meta infringed.

134.    That being said, Meta's infringement has also specifically targeted Plaintiffs' Works, often infringing the very same day Plaintiffs' release their motion pictures.

135.    Repeated training on Plaintiffs' Works is likely to provide Meta's AI programs with unique advantages compared to other companies who complied with copyright laws,

---

[11] Helen Sullivan, *Meta to Spend Hundreds of Millions to Build AI Data Centers,* BBC (Jul. 15, 2025), https://www.bbc.com/news/articles/c1e02vx55wpo.

[12] Annie Minoff & Meghan Bobrowsky, *Why Meta is Offering $100 Million for AI Geniuses,* WALL STREET JOURNAL (Jul. 3, 2025), https://www.wsj.com/podcasts/the-journal/why-meta-is-offering-100-million-for-ai-geniuses/19e12016-466d-4c8c-877c-68eab5018530.

resisting the temptation to acquire free content.

136.    Importantly, Plaintiffs' Works provide for a large volume of high-resolution, 4K UHD, video data consisting of diverse images and actions not seen in traditional mainstream videos.  Plaintiffs' Works provide natural, human-centric imagery, which shows parts of the body not found in regular videos, and a unique form of human interactions and facial expressions.

137.    Plaintiffs' motion pictures contain extended scenes without director cuts which enable AI models to experience continuity in a way that cannot be derived from most television shows or mainstream motion pictures. Plaintiffs' Works additionally provide unique dialog, sound effects, and non-verbal vocalizations not found within either mainstream or competing adult content.

138.    Moreover, Plaintiffs' Works are released in multiple versions and formats, providing for a diversity of quality of the same film, enabling AI models to understand the differences in resolution, encoding and camera capabilities.

139.    In short, Plaintiffs' motion pictures provide a distinct visual model of human form, motion, and interaction with technically rich diverse video quality, containing real-world data, something that is rarely found elsewhere on the Internet.

140.    Meta's AI models benefit from training on diverse human movement data, which Plaintiffs' motion pictures uniquely offer.

141.    For obvious reasons, Meta has not disclosed that it trains its AI models on Plaintiffs' content.  However, an investigation by the Wall Street Journal ("WSJ") recently found that Meta's chat bots are quick to engage in explicit content in the context of romantic role playing.[13]

142.    Repeated training on the same type of content can heavily influence AI models. For example, models will become specialized and learn narrow heuristics that often have difficulty translating to different situations.

---

[13] Jeff Horwitz, *Meta's Digital Companions Will Talk Sex with Users – Even Children*, WALL STREET JOURNAL (Apr. 28, 2025), https://www.wsj.com/tech/ai/meta-ai-chatbots-sex-a25311bf.

19

143.    The WSJ investigation found that "staffers across multiple departments have raised concerns that the company's rush to popularize these bots may have crossed ethical lines, including by quietly endowing AI personas with the capacity for fantasy sex, according to people who worked on them."[14]

144.    As set forth above, Plaintiffs have created some of the most award-winning and successful "fantasy sex" brands of all time.

145.    By training so specifically on Plaintiffs' Works, Meta's AI Movie Gen may very well soon produce full length films with Plaintiffs' identical style and quality, which other real world adult studios cannot replicate.

146.    Meta's AI programs will soon be able to produce motion pictures that look as real as Plaintiffs' Works, and without the significant costs, time, care, and expense that Plaintiffs invest into their motion pictures.

### Plaintiffs Did Not Authorize Meta to Use Its Works

147.    Meta's infringement was without Plaintiffs' knowledge and permission. Plaintiffs did not authorize Meta to use their Works in anyway, including, but not limited to, excessively downloading and distributing Plaintiffs' content through unauthorized sources, or by using Plaintiffs' content for AI training.

148.    Both VXN Scan and the Cross Reference Tool independently recorded multiple infringements in the manner described above. Collectively, they detected Meta distributing without authorization 2,396 of Plaintiffs' Works.  Each of these infringing transactions was recorded with PCAP evidence.

149.    Thus, Meta downloaded, copied, and distributed Plaintiffs' Works without authorization.

150.    Defendant's infringement was continuous and ongoing.

151.    Plaintiffs own the copyrights to the Works and the Works have been registered with the United States Copyright Office.

152.    Plaintiffs seeks statutory damages, attorneys' fees, and costs under 17 U.S.C. §

---

[14] Id.

501 of the United States Copyright Act.

153.    In a recent Senate hearing titled: "Too Big to Prosecute?: Examining the AI Industry's Mass Ingestion of Copyrighted Works for AI Training,"   the Chairman of the Senate Judiciary Subcommittee on Crime and Counterterrorism described the current scale of copyright infringement by Meta, and other AI companies, to be "the largest Intellectual Property theft in American history."[15] The Chairman further stated: "[a]re we going to protect [Americans' creative community], or are we going to allow a few mega corporations to vacuum it all up, digest it, and make billions of dollars in profits—maybe trillions—and pay nobody for it? That's not America."

154.    Plaintiffs, like all copyright holders, have fundamental rights that are being violated by one of the wealthiest companies on the planet. To add insult to injury, Meta's selective and continuous distribution of Plaintiffs' content ensures anyone in the world is always able to access Plaintiffs' content for free, for Meta's own selfish purposes.

155.    Meta's massive, willful, and unrelenting copyright infringement of Plaintiffs' Works has harmed Plaintiffs. Plaintiffs have no choice but to bring this lawsuit in order to stop Meta from continuing to infringe their content and seek redress for the harm Meta's infringement has caused.

### COUNT I

### Direct Copyright Infringement

156.    The allegations contained in paragraphs 1–155 are hereby re-alleged as if fully set forth herein.

157.    Plaintiffs are the owner of the Works, which are original works of authorship. The Works have been registered with the Copyright Office.

158.    Defendant copied and distributed the constituent elements of Plaintiffs' Works using the BitTorrent protocol.

159.    At no point in time did Plaintiffs authorize, permit or consent to Defendant's

---

[15] https://www.judiciary.senate.gov/committee-activity/hearings/too-big-to-prosecute-examining-the-ai-industrys-mass-ingestion-of-copyrighted-works-for-ai-training

distribution of its Works, expressly or otherwise.

160.    As a result of the foregoing, Defendant violated Plaintiffs' exclusive rights to:

(A)    Reproduce its Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501;

(B)    Distribute copies of the Works to the public by sale or other transfer of ownership, or by rental, lease or lending, in violation of 17 U.S.C. §§ 106(3) and 501;

(C)    Perform the copyrighted Works, in violation of 17 U.S.C. §§ 106(4) and 501, by showing the Works' images in any sequence and/or by making the sounds accompanying the Works' audible and transmitting said performance of the work, by means of a device or process, to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definitions of "perform" and "publicly" perform); and

(D)    Display the copyrighted Works, in violation of 17 U.S.C. §§ 106(5) and 501, by showing individual images of the works non-sequentially and transmitting said display of the works by means of a device or process to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definition of "publicly" display).

161.    Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

WHEREFORE, Plaintiffs respectfully requests that the Court:

(A)    Permanently enjoin Defendant from continuing to infringe Plaintiffs' copyrighted Works;

(B)    Order that Defendant delete and permanently remove the digital media files relating to Plaintiffs' Works from each of the computers, data centers, AI clusters, models, and training data under Defendant's possession, custody or control;

(C)    Order that Defendant delete and permanently remove the infringing copies of the Works Defendant has under Defendant's possession, custody or control, including that of its agents, employees and contractors;

(D)    Award Plaintiffs statutory damages per infringed work pursuant to 17 U.S.C. § 504(a) and (c);

(E)    Award Plaintiffs its reasonable attorneys' fees and costs pursuant to 17 U.S.C. §

22

505; and

       (F)      Grant Plaintiffs any other and further relief this Court deems just and proper.

## COUNT 2

### Secondary Copyright Infringement

162.    The allegations contained in paragraphs 1–155 are hereby re-alleged as if fully set forth herein. Plaintiffs allege that Meta is the direct copyright infringer of the Copyrighted Works at issue in this litigation. However, in the event that Meta argues that it is not the direct infringer because its agents or contractors infringed Plaintiffs' Works, then Plaintiffs plead, in the alternative, that Meta is liable for secondary copyright infringement.

163.    Plaintiffs are the owner of the Works, which are original works of authorship. The Works have been registered with the Copyright Office.

164.    In the event Meta contends that someone other than Meta infringed Plaintiffs' Works, Meta is contributorily liable for these acts of direct copyright infringement.

165.    Meta knowingly and materially contributes to, encourages, and induces such infringement by its agents, employees and contractors by paying those infringing Plaintiffs' Works to obtain content for its AI training and providing access to its servers, data centers, IP addresses, computers, networks, accounts, and other tools to facilitate the infringement.

166.    Meta knew or is willfully blind to the infringement because it knows that in order to train AI, it must acquire massive amounts of diverse content.  Meta intentionally decided not to license copyrighted works for AI training purposes. Meta knows that in order for its AI programs to be successful, it must train its AI programs on copyrighted content, including Plaintiffs' Works.  Meta knew it could obtain Plaintiffs' Works and other copyrighted content through pirate websites and networks such as BitTorrent, which is why it forwent efforts to license the content.

167.    Moreover, Plaintiffs informed Meta of the infringement, providing forensic evidence, and Meta still allowed it to continue.

168.    In the event Meta contends that someone other than Meta infringed Plaintiffs' Works, Meta is also vicariously liable for these acts of direct copyright infringement.

169.    Meta has the right and ability to supervise and/or control its own corporate IP addresses, as well as the IP addresses hosted in off-infra data centers, and the acts of its employees and agents infringing Plaintiffs' Works through their residential IPs by using Meta's AI script to obtain content through BitTorrent.

170.    Meta stands to profit billions from its AI models and obtaining content, including Plaintiffs' Works from BitTorrent, enables Meta to avoid licensing Plaintiffs' and others Works.

171.    Instead of taking steps to stop the infringement of Plaintiffs' works on BitTorrent through its corporate IPs, data center IPs, and acts of its employees and contractors, Meta facilitated the infringement by continuing to pay for and provide the tools for the infringement.

172.    Each act of secondary infringement by Meta constitutes a separate and distinct act of infringement.

173.    Meta's acts of secondary infringement are willful, in disregard of and with indifference to Plaintiffs' rights.  Meta is purposefully exploiting Plaintiffs' Works to obtain more content on BitTorrent and will immensely profit from its AI programs because they were trained on Plaintiffs' content and the content of others obtained at Plaintiffs' expense.

174.    As a result of the foregoing, Defendant violated Plaintiffs' exclusive rights to:

(A)    Reproduce its Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501;

(B)    Distribute copies of the Works to the public by sale or other transfer of ownership, or by rental, lease or lending, in violation of 17 U.S.C. §§ 106(3) and 501;

(C)    Perform the copyrighted Works, in violation of 17 U.S.C. §§ 106(4) and 501, by showing the Works' images in any sequence and/or by making the sounds accompanying the Works' audible and transmitting said performance of the work, by means of a device or process, to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definitions of "perform" and "publicly" perform); and

(D)    Display the copyrighted Works, in violation of 17 U.S.C. §§ 106(5) and 501, by showing individual images of the works non-sequentially and transmitting said display of the works by means of a device or process to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definition of "publicly" display).

175.    Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

WHEREFORE, Plaintiffs respectfully requests that the Court:

(A)    Permanently enjoin Defendant from continuing to infringe Plaintiffs' copyrighted Works;

(B)    Order that Defendant delete and permanently remove the digital media files relating to Plaintiffs' Works from each of the computers, data centers, AI clusters, models, and training data under Defendant's possession, custody or control;

(C)    Order that Defendant delete and permanently remove the infringing copies of the Works Defendant has under Defendant's possession, custody or control, including that of its agents, employees and contractors;

(D)    Award Plaintiffs statutory damages per infringed work pursuant to 17 U.S.C. § 504(a) and (c);

(E)    Award Plaintiffs its reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

(F)    Grant Plaintiffs any other and further relief this Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: July 23, 2025

Respectfully submitted,


By:    */s/ Trey D. Brown*

Trey D. Brown (SBN 314469)
Strike 3 Holdings, LLC
11271 Ventura Blvd., Ste. 717
Los Angeles, CA 91604
*trey@strike3holdings.com*
Tel: (323) 347-4721


Christian W. Waugh (FL SBN 71093) *
WAUGH PLLC

25

201 E. Pine St., Ste. 315
Orlando, FL 32901
*cwaugh@waugh.legal*
Tel: (321) 800-6008

Jeremy J. Thompson (MN SBN 402173) *
Law Office of Jeremy J. Thompson PLLC
5200 Wilson Rd., Ste. 150
Edina, MN 55424
*jeremy@jthompson.law*
Tel: (952) 952-1883

*Attorneys for Plaintiffs,*
STRIKE 3 HOLDINGS, LLC and
COUNTERLIFE MEDIA, LLC

*\*Pro Hac Vice application pending*

Complaint – Demand for Jury Trial