1   CLEARY GOTTLIEB STEEN
    & HAMILTON LLP
2   ANGELA L. DUNNING (212047)
    adunning@cgsh.com
3   YE EUN CHARLOTTE CHUN (331459)
    chchun@cgsh.com
4   KIMBERLY BITTINGER (359907)
    kbittinger@cgsh.com
5   1841 Page Mill Rd, Suite 250
    Palo Alto, CA 94304
6   Telephone: +1 (650) 815-4100

7   CLEARY GOTTLIEB STEEN
    & HAMILTON LLP
8   THOMAS W. YEH (287118)
    tyeh@cgsh.com
9   650 California St., Suite 2400
    San Francisco, CA 94108
10  Telephone: +1 (415) 796-4400

11  Attorneys for Defendant
    META PLATFORMS, INC.
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                   SAN JOSE DIVISION

16  STRIKE 3 HOLDINGS, LLC, a Delaware          Case No. 5:25-cv-06213-EKL
    limited liability company, and COUNTERLIFE
17  MEDIA, LLC, a Delaware limited liability    **DEFENDANT META PLATFORMS, INC.'S
    company,                                    NOTICE OF MOTION AND MOTION TO
18                                              DISMISS PLAINTIFFS' COMPLAINT FOR
                                                COPYRIGHT INFRINGEMENT**
19                 Plaintiffs,
                                                Date:   January 21, 2026
20       v.                                     Time:   10:00 a.m.
                                                Ctrm:   7
21  META PLATFORMS, INC., a Delaware
    corporation,                                Judge: Hon. Eumi K. Lee
22
                   Defendant.
23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................... 1

II.    SUMMARY OF RELEVANT FACTS AND ALLEGATIONS................................................. 3

    A.     The Parties........................................................................................................ 3

    B.     Plaintiffs' Allegations of Purported Wrongdoing by Meta............................. 4

III.   LEGAL STANDARDS ...................................................................................................... 7

IV.    ARGUMENT .................................................................................................................. 8

    A.     Plaintiffs Fail To Adequately Plead Direct Copyright Infringement ............................ 8

        1.     Allegations that Meta and third-party IP addresses were used to perform the downloads do not suffice to state a claim ............................................. 8

        2.     Plaintiffs fail to plausibly allege volitional conduct *by Meta* ..................................... 11

    B.     Plaintiffs Fail To Adequately Plead Vicarious Copyright Infringement ................... 15

        1.     Plaintiffs fail to plausibly allege the requisite control ................................................. 15

        2.     Plaintiffs fail to plausibly allege the requisite financial interest ................................. 16

    C.     Plaintiffs Fail To Adequately Plead Contributory Copyright Infringement ............... 17

        1.     Plaintiffs fail to plausibly allege that Meta knew about the alleged infringement....... 17

        2.     Plaintiffs fail to plausibly allege that Meta materially contributed to or induced any infringement .............................................................................................. 19

V.     CONCLUSION .............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001) ................................................................................. 15

*AF Holdings LLC v. Rogers,*
    2013 WL 358292 (S.D. Cal. Jan. 29, 2013) ............................................................... 9

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .............................................................................................. 6, 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................ 7, 14

*In re BitTorrent Adult Film Copyright Infringement Cases,*
    296 F.R.D. 80 (E.D.N.Y. 2012) ................................................................................. 9

*In re Century Aluminum Co. Sec. Litig.,*
    729 F.3d 1104 (9th Cir. 2013) ............................................................................... 7–8

*Cobbler Nevada, LLC v. Gonzales,*
    901 F.3d 1142 (9th Cir. 2018) ........................................................................ *passim*

*Columbia Pictures Industries, Inc. v. Fung,*
    710 F.3d 1020 (9th Cir. 2013) ................................................................................. 20

*Dahlia v. Rodriguez,*
    735 F.3d 1060 (9th Cir. 2013) ................................................................................... 7

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) .................................................................................... 7

*Elf-Man, LLC v. Cariveau,*
    2014 WL 202096 (W.D. Wash. Jan. 17, 2014) ..................................................... 9, 10

*Erickson Productions, Inc. v. Kast,*
    921 F.3d 822 (9th Cir. 2019) ................................................................................... 16

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
    76 F.3d 259 (9th Cir. 1996) ..................................................................................... 15

*In re Google Generative AI Copyright Litigation,*
    2025 WL 2624885 (N.D. Cal. Sept. 11, 2025) ......................................................... 13

*Kadrey v. Meta Platforms, Inc.,*
    788 F. Supp. 3d 1026 (N.D. Cal. 2025) ................................................................... 11

*Kilina Am., Inc. v. Bonded Apparel, Inc.,*
    2019 WL 8065854 (C.D. Cal. Nov. 19, 2019) ......................................................... 16

*Luvdarts, LLC v. AT&T Mobility, LLC,*
    710 F.3d 1068 (9th Cir. 2013) ................................................................................. 17

*Malibu Media LLC v. Duncan*,
  2020 WL 567105 (S.D. Tex. Feb. 4, 2020) ............................................................... 9

*Menzel v. Scholastic, Inc.*,
  2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ...................................................... 14

*MGM Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ............................................................................................. 15

*In re Mosaic LLM*,
  2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ..................................................... 13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ............................................................................. 15

*Perfect 10, Inc. v. Giganews, Inc.*,
  2013 WL 2109963 (C.D. Cal. Mar. 8, 2013), *aff'd*, 847 F.3d 657 (9th Cir.
  2017) .................................................................................................................... 17

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) .........................................................................*passim*

*Somers v. Apple, Inc.*,
  729 F.3d 953, 959 (9th Cir. 2013) ......................................................................... 7

*Strike 3 Holdings, LLC v. Doe*,
  2022 WL 17178309 (N.D. Cal. Nov. 23, 2022).............................................. 11, 14

*Strike 3 Holdings, LLC v. Doe*,
  2023 WL 6542326 (N.D. Cal. Sept. 22, 2023) ...................................................... 3

*Strike 3 Holdings, LLC v. Doe*,
  2024 WL 4260306 (N.D. Cal. Sept. 20, 2024) ...................................................... 9

*Strike 3 Holdings, LLC v. Doe*,
  2025 WL 1665761 (N.D. Cal. June 12, 2025) .................................................... 1, 9

*Talk Radio Network Enters. v. Cumulus Media Inc.*,
  271 F. Supp. 3d 1195 (D. Or. 2017) .................................................................... 15

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ............................................................................. 17

*Venice PI, LLC v. Huseby*,
  2019 WL 1572894 (W.D. Wash. Apr. 11, 2019) ................................................... 9

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019)..................................................................... 17, 19, 20

*Waterman v. TikTok, Inc.*,
  2024 WL 5413655 (C.D. Cal. Oct. 30, 2024) ......................................... 18, 19, 20

*YZ Prods. v. Redbubble*,
  545 F. Supp. 3d 756 (N.D. Cal. 2021) .......................................................... 18–19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

17 U.S.C. § 106 ................................................................................................................... 7, 8

**Court Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 1, 7

<u>**NOTICE OF MOTION**</u>

**PLEASE TAKE NOTICE** that, on January 21, 2026 at 10:00 a.m. in the above-captioned court, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Complaint for Copyright Infringement ("Complaint") with prejudice for failure to state a claim on which relief can be granted. This motion is based on the following memorandum of points and authorities, the accompanying Request to Consider Documents Incorporated by Reference and for Judicial Notice ("RJN") and Declaration of Angela J. Dunning ("Dunning Declaration") with exhibits thereto; all papers on file in this action; and such other matters as may be presented at the hearing. Pursuant to Sections V and VIII of the Court's Standing Order, the parties met and conferred on October 20, 2025 about the bases for this motion and the hearing date.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

The Complaint should be dismissed for failure to plausibly allege that Meta is liable for direct, vicarious, or contributory copyright infringement. The premise of this lawsuit is that persons acting under Meta's direction allegedly downloaded copies of Plaintiffs' adult films to train generative AI video models. Plaintiffs go to great lengths to stitch this narrative together with guesswork and innuendo, but their claims are neither cogent nor supported by well-pleaded facts.

Plaintiffs start with allegations that Meta corporate IP addresses were used to download 157 of Plaintiffs' adult videos via BitTorrent between 2018 and 2025. ¶ 109. This falls well short of plausibly pleading that Meta infringed their copyrights. Under settled Ninth Circuit law, the fact that an IP address is used to download content is insufficient to show that its owner performed the downloading, because any number of people may have access to an IP address. *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018). Plaintiffs are familiar with this case law, as courts have repeatedly admonished them to abide by it, but they nevertheless fail to do so here. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, 2025 WL 1665761, at *1 (N.D. Cal. June 12, 2025).

To state a claim for direct copyright infringement against Meta, Plaintiffs were required to plead facts to show that Meta caused the downloads. Plaintiffs acknowledge this and attempt to

satisfy the requirement by asserting that Meta must have directed the downloads for AI training. But the Complaint fails to plead any facts to substantiate this speculation. To start, Plaintiffs cite no facts to suggest that Meta has ever trained an AI model on adult images or video, much less intentionally so. Just the opposite: the Meta AI Terms of Service *prohibit* using Meta AI models to generate such content. Further, the small number of downloads—roughly 22 per year on average across dozens of Meta IP addresses—is plainly indicative of private personal use, not a concerted effort to collect the massive datasets Plaintiffs allege are necessary for effective AI training. And Plaintiffs do not explain how sporadic torrenting activity that purportedly commenced in 2018— years before Meta allegedly "*began* researching Multimodal Models and Generative Video" in 2022 (¶ 41)—could have been intended for "purposes of acquiring content to train" such models.[1] Plaintiffs' supposition that Meta must have instigated these downloads for AI training is implausible on its face. All Plaintiffs have are IP addresses, which is insufficient to state a claim.

Presumably recognizing that the above allegations suggest, at most, that Meta contractors, visitors, or employees may have used Meta's internet access over the years to download videos for personal use, Plaintiffs seek to inflate the numbers to fit their theory. They point to 97 additional downloads made using the home IP address of a Meta contractor's father, but plead no facts plausibly tying Meta to those downloads, which are plainly indicative of personal consumption. ¶¶ 103–105. They also point to unspecified "correlations" they claim to have observed in alleged downloads of *third-party* content (books, TV shows, video games, etc.) across Meta and non-Meta IP addresses, speculating that Meta must have used an additional 2,500 "hidden" third-party IP addresses to download ~2,300 of their Works over the seven-year period. ¶ 94. But the Complaint lacks any plausible basis for linking Meta to these third-party IP addresses, the (unidentified) persons who used them, or the downloads of Plaintiffs' content (Ex. F) and third-party content (Exs. B and C) those unidentified persons allegedly made. As with all others, the timing and number of those downloads point solely to personal use, not AI training. And there is yet another conundrum Plaintiffs fail to address: why would Meta seek to "conceal[]" certain alleged downloads of

---

[1] Unless otherwise stated, citations to "¶" and "Ex." are to the Complaint's paragraphs and exhibits; all emphases are added, and internal citations and quotation marks are omitted.

Plaintiffs' and third-party content, but use easily traceable Meta corporate IP addresses for many hundreds of others, including 157 of Plaintiffs' works?  The obvious answer is that it would not do so; Plaintiffs' entire AI training theory is nonsensical and unsupported.

Absent facts to plausibly show that Meta caused (or was even aware of) the downloads at issue, the Complaint fails to state a claim for direct infringement by Meta.  Plaintiffs' claim for contributory infringement is defective for the same reasons, and because the Complaint does not allege facts to show that Meta intentionally induced or encouraged infringement or that there were simple measures Meta could have taken, but failed to take, to discover or prevent it.  And vicarious liability requires a showing that Meta had not only the right and ability to control the infringement but also a direct financial interest in it—something Plaintiffs come nowhere close to adequately pleading, because their conjecture that Meta ordered the downloading for AI training is untenable and unsupported.  The entire Complaint should be dismissed with prejudice.

## II.   SUMMARY OF RELEVANT FACTS AND ALLEGATIONS

### A.   The Parties

**Plaintiffs:**  Plaintiffs Strike 3 Holdings, LLC ("Strike 3") and Counterlife Media, LLC ("Counterlife") are companies that produce adult films.  ¶¶ 2–3.  Strike 3 alleges that it owns copyrights in works distributed through the *Blacked*, *Tushy*, *Vixen*, *Tushy Raw*, *Blacked Raw*, *Milfy*, *Wifey*, and *Slayed* adult content websites, and Counterlife alleges that it owns copyrights in works distributed through the *Deeper* website (collectively referred to by Plaintiffs as "Works").  ¶ 3.  As this Court has recognized, Strike 3 "files thousands of lawsuits" and "has been labeled by some as a 'copyright troll' that files extortive lawsuits."  *Strike 3 Holdings, LLC v. Doe*, 2023 WL 6542326, at *2 (N.D. Cal. Sept. 22, 2023).

**Meta:**  Meta is an international technology company that owns and operates popular social media services such as Facebook, Instagram, and WhatsApp.  ¶ 34.  Meta has also been at the forefront of modern AI research and has developed a number of groundbreaking AI video and multimodal models.  According to Plaintiffs, Meta "began researching Multimodal Models and Generative Video" in 2022, going on that year to release both ImageBind, a "model trained to align multiple modalities including video," and Make-A-Video, "Meta's first major text-to-video

generation model." ¶ 41.  Plaintiffs allege that the release of Movie Gen, a "suite of AI models that … use simple text inputs to produce custom videos …, edit existing videos, and transform your personal image into a unique video," followed two years later in 2024, and that Meta more "recently" released both its Llama 4 large language model, allegedly the "first version of Llama to incorporate video training," and V-JEPA 2, a "powerful self-supervised video world model for understanding, predicting and planning in physical environments." ¶¶ 45–52.  Other alleged Meta projects include SlowFast, "networks designed specifically for action recognition in videos," released in 2019 (¶ 39); and "Ego4D," a *dataset* of "egocentric, first-person video" shot from head-mounted cameras, released in 2021.  ¶ 40; Dunning Ex. 3 at 1, 4 (*Ego4D: Around the World in 3,000 Hours of Egocentric Video*, available at https://arxiv.org/pdf/2110.07058).  As Plaintiffs acknowledge, AI training requires "massive amounts of diverse content" to "effectively train."  ¶¶ 47, 166.

### B.    Plaintiffs' Allegations of Purported Wrongdoing by Meta

Plaintiffs' copyright claims turn on the theory that Meta downloaded their works without permission to train AI video models.  More specifically, Plaintiffs allege that, using the "BitTorrent protocol," Meta downloaded Plaintiffs' Works "for purposes of acquiring content to train its Meta Movie Gen, Large Language Model ('LLaMA'), as well as various other Meta AI Models that rely on video training content."  ¶¶ 5, 7.  As support, Plaintiffs identify "forty-seven IP addresses … owned by Facebook [Meta]" (Ex. A) that were purportedly used by unidentified individuals to download 157 of Plaintiffs' Works over a seven-year period from 2018 to 2025—roughly 22 Works per year.  ¶¶ 56, 109, 157; Ex. F.  Plaintiffs claim that they "confirmed each IP address [] in Exhibit A belonged to Meta by utilizing IP address geolocation technology by Maxmind Inc. ('Maxmind')," an "industry-leading provider of IP address intelligence."  ¶¶ 58–59.  The Complaint does not identify any of the individuals who supposedly used these Meta IP addresses, allege that any were employed by Meta or had any role in AI training at Meta, or specify whether (and which) content allegedly downloaded was used to train any particular Meta model.

To bolster their allegations that this minimal activity must nevertheless have been directed by Meta for AI training, rather than undertaken "for personal use" by individuals utilizing Meta's global networks without its knowledge (¶ 102), Plaintiffs assert that Meta also engaged in torrenting

activity using *non-Meta* IP addresses.  More specifically, Plaintiffs claim to have "discovered" more than 2,500 third-party IP addresses, grouped into seven "ranges" and referred to by Plaintiffs as IP Ranges A through G, that were allegedly "operating in conjunction with Meta's corporate IP addresses."  ¶¶ 97–102 (IP Ranges A–F each have 256 addresses, and IP Range G has 1,024, for a total of 2,560).  Plaintiffs allegedly reached this conclusion based on their identification of certain "correlations" in the "data patterns" of downloads using Meta and non-Meta IP addresses between December 11, 2022 to December 12, 2024.  ¶¶ 94–96; Exs. B, C.  These "correlations" purportedly consist of "patterns involving mass infringement beyond what a human could consume"; "[s]imilar content being downloaded on the same day or at or near the same time as on Meta's corporate IP addresses"; "[s]imilar targeting of certain types of content featuring specific languages"; and instances "where the same content is being torrented in different resolutions at or around the same time."  ¶ 94.  The Complaint does not specify which of the 4,866 downloads itemized in Exhibits B and C are supposed to show any of these alleged attributes or "correlations."

Notably, the 4,866 downloads listed in Exhibits B and C are *not* of Plaintiffs' Works.  ¶ 96 n. 10.  Those exhibits show "works owned by *other* rights holders," *id.*, and range from episodes of popular TV shows (*see, e.g.*, Ex. B lines 362, 4,857) to cookbooks (line 97), photos (line 25), Hollywood movies (line 4,855), video games (line 353), newspapers (line 393), sports events (line 4,203), music (line 486), and adult content (line 514).  Plaintiffs do not assert that there was any observable correlation between alleged downloads of *Plaintiffs'* Works using Meta and non-Meta IP addresses (as reflected in Exhibit F).  The Complaint does not explain how Plaintiffs identified the universe of downloads to evaluate or why they chose to examine downloads of third-party works rather than their own.  Nor does it assert that the alleged "correlations" bear any statistical significance or differ from what one would expect to see in a random sampling of torrent activity.

Nevertheless, based on the alleged "correlations," Plaintiffs assert that all 2,500+ third-party IP addresses in Ranges A through G "operat[e] in conjunction with Meta's corporate IP addresses" and, as such, must be "hidden" IP addresses Meta used to "conceal" its torrenting of Plaintiffs' Works.  ¶¶ 90, 94, 101.  That is, Plaintiffs allege that "Meta" downloaded 157 of Plaintiffs' Works listed in Exhibit F using readily identifiable Meta corporate IP addresses, while simultaneously

using third-party IP addresses to "conceal" other alleged downloads of both Plaintiffs' and third-party works.  Unlike for the 47 Meta corporate IP addresses, Plaintiffs do not allege that they ran any IP addresses in Ranges A through G through Maxmind to ascertain their owners.  Instead, they allege "[u]pon information and belief" that six of these seven ranges (A–F) correspond to "six different servers" Meta is alleged in another litigation to have used for torrenting books, without identifying any factual basis for that assertion.[2]  The seventh range, IP Range G, is alleged to belong to a Hawaiian non-profit with no alleged affiliation to Meta.  ¶ 99.

Plaintiffs also identify a residential IP address in California allegedly used to torrent its Works.  According to the Complaint, that address belongs to the father of an individual who worked "on a contract basis" at Meta.  ¶¶ 103–06.  The alleged torrenting activity at that address purportedly stopped in 2024 when the individual's contract ended and he relocated to New York.  ¶¶ 105–06.  Plaintiffs allege that this residential IP address was used to download 178 third-party works and 97 of Plaintiffs' Works through November 2024.  ¶ 104; Exs. B, F.

Aggregating all of the foregoing activity, Plaintiffs allege that there were a total of 6,008 torrents of 2,396 of their Works between 2018 and 2025, 157 of which were allegedly performed using a Meta corporate IP address.  ¶¶ 108–09, Exs. E, F.  Exhibit F shows duplicative downloads of many of these works, often years apart.  *See, e.g.*, Ex. F Work 1 (alleging four downloads using the Meta IP address [2019], and IP addresses in Ranges A, B and F [all in 2025]) and Work 11 (alleging three downloads by IP addresses in Ranges A [2023], C [2024], and F [2025]).[3]

Plaintiffs also claim that Meta distributed some of their Works (listed in Exhibit G) by making them available to others after Meta had downloaded them (called "seeding").  ¶¶ 112, 116.  Exhibit G does not show any IP addresses at all, let alone that any Meta corporate IP addresses were used for this purported activity.  Likewise, although Exhibit H purportedly "illustrates five episodes where a specific site operated by Plaintiffs was targeted for distribution," the Exhibit

---

[2] Plaintiffs repeatedly offer conclusions they have allegedly drawn from documents filed in *Kadrey v. Meta Platforms, Inc.*, No. 23-3417-VC (N.D. Cal.), without placing those documents before the Court.  Plaintiffs' conclusory characterizations of those documents are "not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and Meta disputes them.
[3] Exhibit F is sorted by Work, rather than date.  For the Court's convenience, Meta has also sorted the information in Ex. F chronologically so the Court can see the intermittent nature of the alleged downloading over the years.  *See* Dunning Decl. ¶ 6 & Ex. 12.

affirmatively establishes that Meta corporate IP addresses were *not* involved in those "episodes." ¶ 119, Ex. H.

Plaintiffs filed this suit on July 23, 2025, asserting claims against Meta for direct, vicarious, and contributory copyright infringement under 17 U.S.C. § 106.  Specifically, Plaintiffs allege that the purported torrenting resulted in reproduction (downloading) (17 U.S.C. § 106(1)), distribution (uploading to others) (*id.* § 106(3)), performance (*id.* § 106(4)), and display (*id.* § 106(5)) of their Works.  ¶ 160.  Each claim hinges on allegations that Meta knew about the alleged torrenting of Strike 3 content and directed that activity to acquire adult content to train its AI models.

Notably, Plaintiffs do not allege that any of their adult videos was, in fact, used by Meta to train any specific AI model.  They do not allege that any Meta AI model has ever generated adult video.  To the contrary, Section 1(B) of the Meta AI Terms of Service, titled "Acceptable Uses," instructs users: "You may not access, use, or allow others to access or use AIs in any manner that would … Generate, promote, disseminate, or otherwise use or facilitate adult content, such as … pornography, and content meant to arouse sexual excitement."  Dunning Ex. 4.

### III.   LEGAL STANDARDS

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court need not "accept as true allegations that contradict … matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013) (same); *Twombly*, 550 U.S. at 555 (courts need not "accept as true a legal conclusion couched as a factual allegation").

When there are "two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' [its] favored explanation but are also consistent with the alternative explanation."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)).  Instead, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*."  *Id.* (citing *Twombly*, 550 U.S. at 554).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.

## IV.    ARGUMENT

The facts alleged in the Complaint establish, at most, that Meta and non-Meta IP addresses were used by unidentified persons to torrent Plaintiffs' Works sporadically over seven years.  Under well-settled law, such allegations do not plausibly show that Meta was aware of the downloads, much less that Meta, itself, conducted or directed this activity.  The Complaint thus fails to state a claim against Meta for direct, contributory, or vicarious copyright infringement.

### A.    Plaintiffs Fail To Adequately Plead Direct Copyright Infringement

To state a claim for direct copyright infringement, a "plaintiff 'must show ownership of the allegedly infringed material' and 'demonstrate that the alleged infringers violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.'"  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (citation omitted).  Direct infringement also "requires the plaintiff to show causation (also referred to as 'volitional conduct') by the defendant."  *Id.* (citation omitted).  Dismissal is appropriate where the alleged facts do not plausibly establish that defendant's own volitional conduct was "the direct cause of the infringement."  *Id.* at 668–670 (affirming dismissal on the ground that the defendant was not the direct cause of the allegedly infringing display, distribution, and reproduction of plaintiff's works) (citation omitted).

#### 1.    Allegations that Meta and third-party IP addresses were used to perform the downloads do not suffice to state a claim

The crux of Plaintiffs' copyright claims is that Meta corporate IP addresses were used to torrent their Works.  This comes nowhere close to stating a claim for direct infringement *by Meta*.

In the Ninth Circuit, a defendant's "status as the registered subscriber of an infringing IP address, standing alone, does not create a reasonable inference that he is also the infringer."  *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018).  That is because "simply

establishing an account does not mean the subscriber is even accessing the internet, and multiple devices can access the internet under the same IP address." *Id.* at 1146; *see id.* at 1145 ("multiple devices and individuals may be able to connect via an IP address"). The inference becomes even weaker where, as here, "numerous people … visit a facility that uses the same internet service." *Id.* However, "this complication does not change the plaintiff's burden to plead factual allegations that create a reasonable inference that the *defendant* is the infringer." *Id.* at 1146–47.

District courts in the Ninth Circuit have dismissed copyright claims for failure to satisfy this basic pleading standard. *See, e.g., Elf-Man, LLC v. Cariveau*, 2014 WL 202096, at *2 (W.D. Wash. Jan. 17, 2014) (dismissing direct infringement claim against defendant identified through IP address as it was "also possible that a family member, guest, or freeloader engaged in the infringing conduct"); *Venice PI, LLC v. Huseby*, 2019 WL 1572894, at *1–2 (W.D. Wash. Apr. 11, 2019) (dismissing complaint where plaintiff's claims "do not indicate that the subscriber of the IP address … was aware of the alleged infringement"); *see also AF Holdings LLC v. Rogers*, 2013 WL 358292, at *2–3 (S.D. Cal. Jan. 29, 2013) (ordering plaintiff to provide a more definite statement of the factual basis for its claim that defendant was the infringer, beyond mere ownership of the IP address).

So, too, have courts in other circuits. *See Malibu Media LLC v. Duncan*, 2020 WL 567105, at *6 (S.D. Tex. Feb. 4, 2020) (dismissing direct infringement claim against defendant identified through IP address as the complaint contained no allegations that defendant had "acknowledged personal involvement in any download or distribution," that defendant had "exclusive access to his IP address," or other circumstances "which might increase the likelihood that the subscriber is the infringer"); *In re BitTorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. 80, 84 (E.D.N.Y. 2012) ("[I]t is no more likely that the subscriber to an IP address carried out a particular computer function—here the purported illegal downloading of a single pornographic film—than to say an individual who pays the telephone bill made a specific telephone call.").

And Plaintiffs are plainly aware of their pleading obligations under *Cobbler*. *See Strike 3 Holdings, LLC v. Doe*, 2025 WL 1665761, at *1 (N.D. Cal. June 12, 2025); *Strike 3 Holdings, LLC v. Doe*, 2024 WL 4260306, at *1 (N.D. Cal. Sept. 20, 2024) (Strike 3 "cannot rely on a bare allegation

1  that a defendant is the registered subscriber of an [IP] address associated with infringing activity to

2  state a plausible claim for direct or contributory copyright infringement.").  Yet, they flout it.

3      Plaintiffs allege that 47 different Meta corporate IP addresses were used to torrent 157 of

4  Plaintiffs' Works between 2018 and 2025—an average of roughly 22 per year.  But the Complaint

5  is devoid of well-pleaded facts to establish who allegedly made those sporadic downloads—let

6  alone that Meta even knew about them.  Tens of thousands of employees (Dunning Ex. 1 at 7;

7  Dunning Ex. 2 at 1) and innumerable contractors, visitors, and third parties access the internet at

8  Meta every day.  While it is possible one or more Meta employees downloaded Plaintiffs' videos,

9  it is just as possible, as recognized in *Elf-Man*, that a "guest, or freeloader," or contractor, or vendor,

10  or repair person—or any combination of such persons—was responsible for that activity.  2014 WL

11  202096, at *2.  Plaintiffs simply have no idea who downloaded these Works, and do not plead facts

12  plausibly showing that it was Meta.  The fact that Meta IP addresses were used for the downloads

13  is "merely consistent with [Meta's] liability, … stop[ping] short of the line between possibility and

14  plausibility of entitlement to relief.'"  *Cobbler*, 901 F.3d at 1147 (citing *Iqbal*, 556 U.S. at 678).

15      Plaintiffs' allegations as to the residential IP address are likewise defective.  This IP address

16  allegedly belonged to the father of a Meta contractor, and the contractor is not alleged to have lived

17  at the California residence.  Even assuming that the contractor (and not friends, visitors, freeloaders,

18  or household members) downloaded 97 of Plaintiffs' videos using that IP address, that does not

19  plausibly establish that Meta had anything to do with it.  ¶¶ 103–06 & Exs. B, F.  This is especially

20  so given the lack of any pleaded basis to presume that the contractor's work as an "automation

21  engineer" included sourcing AI training data.  *Id.*  And the fact that the torrenting allegedly stopped

22  when his contract with Meta ended (¶ 105) says nothing about whether the alleged torrenting was

23  performed with Meta's knowledge or at its direction.  Plaintiffs also allege that the contractor

24  moved to New York (¶ 106), after which he would presumably not have used that IP address.[4]

---

[4] Plaintiffs cite to *Kadrey* D.E. 568-9 for the proposition that "Meta employees were asked to use their home Internet IP addresses to process content downloaded from pirate websites." ¶ 107. The document shows nothing of the sort.  It is an internal chat among two Meta employees, discussing books and scientific articles ("e-pubs/PDFs"), in which one volunteers to transfer text data to the "home dir" on his Meta laptop.  Dunning Ex. 6.  The document certainly allows no inference that *this* purported contractor (or anyone else) was asked to download pornography using a home IP

Plaintiffs' allegations as to downloads by the IP addresses in Ranges A–G are even further afield. Plaintiffs know how to find the owner of an IP address using multiple methods. *See* ¶¶ 58–60 (alleging use of Maxmind to confirm the Meta corporate IP addresses); ¶ 104 (describing use of subpoena to identify residential IP address). Yet, they inexplicably failed to look up any of the IP addresses in Ranges A–F or, if they did, chose not to share the results of their findings in the Complaint. In any event, Plaintiffs do not explain how they jumped to the conclusion that there is any connection between the six alleged virtual cloud servers and the more than 1,500 IP addresses comprising Ranges A–F, or even allege that six servers *could* correspond to that many IP addresses. Nor is any explanation given for how Range G—allegedly registered to a Hawaiian non-profit—is supposedly connected to Meta. ¶ 99.

The only thing that can be discerned from the Complaint is that the IP addresses in Ranges A–G do *not* belong to Meta. This precludes any "reasonable inference that [Meta is []] the infringer" and fails to "raise a right to relief above a speculative level." *Cobbler*, 901 F.3d at 1145–46, 1147; *see also Strike 3 Holdings, LLC v. Doe*, 2022 WL 17178309, at *4 (N.D. Cal. Nov. 23, 2022) (describing efforts to attribute infringement to someone other than the IP subscriber as "particularly problematic").

### 2. Plaintiffs fail to plausibly allege volitional conduct *by Meta*

Plaintiffs also fail to plead the essential element of volitional conduct. "As the name suggests, *direct* liability must be premised on conduct that can reasonably be described as the direct cause of the infringement." *Giganews*, 847 F.3d at 666 (citation omitted) (emphasis in original). Accordingly, to state a claim for direct infringement *against Meta*, Plaintiffs must allege sufficient facts to show a "volitional act" of infringement *by Meta*. *Id.* Plaintiffs plead no such facts here.

Plaintiffs' theory of volitional conduct is that Meta directed a contractor with no alleged involvement in AI training and other, unidentified persons to torrent Plaintiffs' Works for AI training. If anything, however, Plaintiffs' factual allegations only tend to *dis*prove this speculative theory. First, the Complaint identifies only 157 torrents of Plaintiffs' Works by 47 Meta corporate

---

address. On June 25, 2025, Judge Chhabria granted summary judgment to Meta on plaintiffs' direct infringement claim, finding that its downloading of books to train Llama was fair use as a matter of law. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1059–60 (N.D. Cal. 2025).

1    IP addresses spread across seven years.  ¶ 109.  The residential IP address adds only 97 additional

2    torrents.  ¶ 104.  Plaintiffs concede that AI training requires "massive amounts" of data (¶ 166)—

3    not a few dozen titles per year intermittently obtained one file at a time.

4           Second, Plaintiffs make no attempt to connect the timing of the alleged torrenting activity,

5    which commenced no later than 2018,[5] with the training of any AI model designed to generate

6    video.  To the contrary, Plaintiffs allege that Meta did not "beg[i]n researching" any such model

7    until 2022.[6]  Those dates simply do not match up.  Likewise, the Complaint cites to a *Kadrey*

8    deposition transcript excerpt to allege that Meta used six virtual servers to torrent content for AI

9    training.  ¶ 92 (citing *Kadrey* D.E. 490-37 at 3).  Notably, the cited excerpt states that the torrenting

10   activity involving those servers began in 2024, *not* six years earlier, in 2018, as would have to be

11   the case if the six servers actually corresponded to IP Ranges A–F, as Plaintiffs baselessly assert.

12   Indeed, the witness testified that the alleged "two months of torrenting" that used those servers

13   began in April 2024 and ended in June 2024.  *See* Dunning Ex. 7.  Thus, Plaintiffs' own allegations

14   and cited documents belie, rather than support, their narrative.

15          Third, it is not even possible to tell from the Complaint which Works, if any, Plaintiffs

16   contend were used to train any of the "various [] Meta AI Models," or which specific models

17   Plaintiffs are accusing.  ¶ 7.  The only model Plaintiffs even suggest may have been trained on their

18   Works is Movie Gen, which they speculate "may very well soon produce full length films with

19   Plaintiffs' identical style and quality" that "look as real as Plaintiffs' Works."  ¶¶ 145–46.  However,

20   Plaintiffs do not allege any instance of this happening or any other basis for their supposition that

21   Movie Gen may have been trained on their Works.  This defect is glaring, considering the Meta AI

22   Terms of Service explicitly prohibit users from attempting to generate adult content or pornography,

23   contradicting the premise that such materials might even be useful for Meta's AI training.  Dunning

24   Ex. 4 at Section 1(B).

25

26

27   ───────────────
     [5] The first torrenting activity Plaintiffs allege dates to 2018, but they leave unstated whether the
     activity began even earlier, which would render their AI training theory all the more implausible.
28   [6] Plaintiffs do not allege that SlowFast (2019) and Ego4D (2021) were generative AI models, and
     it is not clear from the Complaint if or why Plaintiffs think they are relevant.  *See* ¶¶ 39, 40.

Notably, just last month, this Court granted dismissal in *In re Google Generative AI Copyright Litigation* on the grounds that the Complaint "fail[ed] to plausibly allege copyright infringement" as to models "referenced only one time in the complaint in a long list of what appears to be every generative AI model that [defendant] has ever developed" and "Plaintiffs d[id] not allege that any of their works were included in training datasets used to develop these models." 2025 WL 2624885, at *7 (N.D. Cal. Sept. 11, 2025) (Lee, J.). The court did the same in *In re Mosaic LLM*, finding that "Plaintiffs do not allege facts that could establish that the [AI] models are actually trained on any shadow library websites, let alone those that contain Plaintiffs' works." 2025 WL 2402677, at *2–3 (N.D. Cal. Aug. 19, 2025). Here, Plaintiffs do not plead any facts to support their theory that Meta actually used their Works in AI training, because there are none. Plaintiffs' entire AI training theory is just a narrative they fabricated in an attempt to attribute to Meta isolated downloads of adult content by unknown third parties.

Fourth, Plaintiffs also allege that "Meta made the deliberate choice to seed Plaintiffs' motion pictures in order to capitalize on faster download speeds so it could infringe other content faster." ¶ 129. Plaintiffs do not identify any "other content" that the alleged seeding purportedly sped up downloads for. In fact, Plaintiffs allege no facts at all to support their surmise that seeding a work enables the seeder to simultaneously download other works more quickly. Nor do they attempt to match up any alleged seeding of their Works with the alleged downloading of any other works. And critically, none of the purported "seeding" activity is alleged to have involved Meta IP addresses or even the residential IP address (*see* ¶ 116 & Exs. G, H), so this cannot have been the motivation for those downloads in any event.

Fifth, Plaintiffs allege that many of the titles downloaded using Meta IP addresses were also downloaded by IP addresses in Ranges A–G and the residential IP address, resulting in a hodgepodge of duplicative, haphazard activity. ¶ 110; *see also* Ex. F (reflecting that Work 98 was allegedly torrented on five separate occasions by a Meta IP address, the residential IP address, and addresses in IP Ranges A, B, and F in 2024 and 2025). Even aggregating all alleged torrents, Plaintiffs plead at most that 2,396 of their Works were downloaded a total of 6,008 times by more than 2,500 IP addresses—an average of fewer than 2.5 works per IP address *over the entire seven*

*years*.  The far more plausible inference to be drawn from such meager, uncoordinated activity is that disparate individuals downloaded adult videos for personal use, not as part of a "methodical," concerted effort by Meta to gather the "massive amounts" of data required for effective AI training.  *See Strike 3 Holdings, LLC v. Doe*, 2022 WL 17178309, at *1 (N.D. Cal. Nov. 23, 2022) (single individual downloaded 122 Strike 3 "digital media files" over 18 months for personal consumption); Complaint for Copyright Infringement, *Strike 3 Holdings, LLC v. Doe*, 5:21-cv-08818-SVK (N.D. Cal. Nov. 12, 2021), Dkt. 1, Ex. A.  Plaintiffs' hunting-and-pecking allegations here stand in stark contrast to *Kadrey* and other AI training cases in which other plaintiffs allege that their works were part of immense third-party datasets downloaded en masse for AI training.  *See, e.g.*, ¶¶ 47, 53, 54, 156.

Finally, in an effort to manufacture a basis to infer that all of this alleged torrenting activity was coordinated under Meta's direction for AI training, Plaintiffs assert that Meta orchestrated a seven-year campaign to "conceal its [alleged] BitTorrent activities" using more than 2,500 third-party IP addresses (¶ 90) while simultaneously using its own, readily identifiable corporate IP addresses to torrent hundreds of other titles, including 157 of Plaintiffs' Works, between 2018 and 2025.  Plaintiffs do not explain why, if this activity was being directed by Meta and Meta wanted to conceal it, it would continue to openly use its own corporate IP addresses for this purported torrenting activity into 2025.  *See, e.g.*, Ex. F at Work 253.  Rather than "nudg[ing]" Plaintiffs' claims "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, this contortion only serves to demonstrate how nonsensical Plaintiffs' allegations are.  The only explanation that plausibly fits the facts is that the downloads at issue were for personal use by various individuals, and not directed by Meta.

At most, Plaintiffs assert that some Meta IP addresses were used to torrent their Works, and that Meta has been accused in another case of torrenting different works (entire datasets of books and scientific articles) for AI training.  That does not suffice to state a plausible claim that *Meta directly infringed Plaintiffs'* Works by copying or distributing them.  *See Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *3 (N.D. Cal. Mar. 19, 2018) (dismissing infringement claim because plaintiff cannot rely on other copyright infringement cases against the defendant "to establish an

1  inference of a pattern or practice of improper conduct" from which an inference of improper

2  conduct against the plaintiff might be inferred); *Talk Radio Network Enters. v. Cumulus Media Inc.*,

3  271 F. Supp. 3d 1195, 1214 (D. Or. 2017) ("a complaint must state more than a suspicion to

4  proceed").  As Plaintiffs fail to plausibly allege that Meta knew about or directed any torrenting

5  here, their allegation that Meta "specifically targeted Plaintiffs' content for distribution" (¶ 111)

6  also fails, as do any claims based on performance or display.  The direct infringement claim should

7  be dismissed.

8            **B.      Plaintiffs Fail To Adequately Plead Vicarious Copyright Infringement**

9           Plaintiffs likewise fail to plausibly allege that Meta is vicariously liable for the alleged

10  infringement.  Vicarious liability for copyright infringement is an "outgrowth of the agency

11  principles of respondeat superior." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th

12  Cir. 1996); *see also A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001)).  It

13  extends beyond a strict employer-employee relationship to "a defendant whose economic interests

14  [in the infringement are] intertwined with the direct infringer's, but who [does] not actually employ

15  the direct infringer." *Id.* (citations omitted).  To state a claim for vicarious copyright infringement,

16  Plaintiffs were required to plead: (1) an act of direct infringement by another party; (2) that Meta

17  exercises control over (i.e., has the "right and ability to supervise") that infringing conduct; and (3)

18  that Meta had a direct financial interest in the infringing activity. *Perfect 10, Inc. v. Amazon.com,*

19  *Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) (hereinafter, "*Amazon*"); *MGM Studios, Inc. v. Grokster,*

20  *Ltd.*, 545 U.S. 913, 930 (2005) (a defendant "infringes vicariously by profiting from direct

21  infringement while declining to exercise a right to stop or limit it").

22          Even assuming for the sake of argument that Plaintiffs have adequately pleaded acts of

23  direct infringement by unidentified third parties, Plaintiffs cannot satisfy the second or third prongs

24  because they have no facts to show that Meta controlled or financially benefitted from those acts.

25                  **1.      Plaintiffs fail to plausibly allege the requisite control**

26          To plead the second element of vicarious copyright infringement, Plaintiffs are required to

27  allege facts plausibly showing that Meta "exercise[d] control over a direct infringer," i.e., that it

28

had "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Amazon*, 508 F.3d at 1173.  The Complaint falls well short.

The sum total of Plaintiffs' control allegations are that Meta "has the right and ability to supervise and/or control its own corporate IP addresses, as well as the IP addresses hosted in off-infra data centers, and the acts of its employees and agents infringing Plaintiffs' Works through their residential IPs by using Meta's AI script to obtain content through BitTorrent." ¶ 169.  As discussed above, however, the Complaint is devoid of facts that would allow the Court to conclude that Meta was aware of the infringement, much less that it could have supervised or stopped unidentified persons from using Meta (or third-party) IP addresses to download illicit content. Plaintiffs' conclusory allegation of control by Meta is insufficient to state a claim for vicarious infringement.  *See Giganews*, 847 F.3d at 664, 673 (affirming dismissal where allegations of control were conclusory and failed to establish actual control over the specific infringing activity); *Kilina Am., Inc. v. Bonded Apparel, Inc.*, 2019 WL 8065854, at *2 (C.D. Cal. Nov. 19, 2019) ("Merely alleging that the Defendants had the 'right and ability to supervise the infringing conduct' lacks the requisite detail to sustain a claim ....").

### 2.    Plaintiffs fail to plausibly allege the requisite financial interest

Plaintiffs also fail to adequately plead the third element for vicarious liability—that Meta has a "direct financial interest" in the supposed infringement.  *Perfect 10*, 847 F.3d at 673.  As discussed, Plaintiffs failed to plausibly allege that Meta was aware of or directed the alleged downloads of its Works for AI training, or even that any of Plaintiffs' Works were, in fact, used for AI training at Meta.  Plaintiffs' allegation that "Meta stands to profit billions from its AI models" (¶ 170) is, thus, irrelevant.  Plaintiffs' remaining allegation of direct financial interest—that "obtaining content, including Plaintiffs' Works from BitTorrent enables Meta to avoid licensing Plaintiffs' and others Works" (*id.*)—fails for the same reason, and because the Ninth Circuit has explicitly held that "avoidance of licensing fees" is not a direct financial benefit that can support vicarious liability.  *Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 830 (9th Cir. 2019).

1    **C.**    **Plaintiffs Fail To Adequately Plead Contributory Copyright Infringement**

2        Contributory liability requires a plaintiff to prove that a defendant "(1) has knowledge of

3    another's infringement and (2) either (a) materially contributes to or (b) induces that infringement."

4    *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (quoting *Perfect 10, Inc. v. Visa*

5    *Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007)).  Plaintiffs fail to satisfy any of these elements.

6        **1.**    **Plaintiffs fail to plausibly allege that Meta knew about the alleged infringement**

7        The Ninth Circuit has consistently held that a plaintiff must demonstrate that the defendant

8    had "actual knowledge of specific acts of infringement" or be "willfully blind to the infringement

9    that was occurring."  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013);

10   *Giganews*, 847 F.3d at 671 ("[A] 'computer system operator' is liable under a material contribution

11   theory of infringement 'if it has *actual* knowledge that *specific* infringing material is available using

12   its system.'").  "[W]illful blindness requires that the infringing party (1) subjectively believed that

13   infringement was likely occurring on their networks and that they (2) took deliberate actions to

14   avoid learning about the infringement."  *VHT*, 918 F.3d at 748; *Luvdarts*, 710 F.3d at 1073 (mere

15   "indifferen[ce] to the risk of copyright infringement" is not sufficient).  "'[A]bsent any specific

16   information which identifies infringing activity, a computer system operator cannot be liable for

17   contributory infringement merely because the structure of the system allows for the exchange of

18   copyrighted material.'"  *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1021

19   (9th Cir. 2013) (quoting *A&M Recs., Inc. v. Napster, Inc*., 239 F.3d 1004, 1024 (9th Cir. 2001));

20   *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013), *aff'd*, 847 F.3d 657

21   (9th Cir. 2017) (dismissing contributory liability claim where plaintiff failed to plead that the

22   defendant knew of specific infringing works).

23       As discussed above, the facts in the Complaint do not plausibly establish that Meta was

24   aware of the specific torrents at issue.  To the contrary, the sporadic downloads of Plaintiffs' Works

25   allegedly traced to Meta's corporate IP addresses suggest the opposite: that any such downloads

26   were isolated instances of personal consumption that the infringers would have kept private.

27

28

Moreover, Plaintiffs do not allege that Meta was willfully blind to the alleged torrenting, i.e., that it took active steps to avoid learning about it. Indeed, outside of their speculative and unsupported assumption that Meta must have directed the torrents for AI training, Plaintiffs allege no facts to suggest that Meta would have been aware of, or even could have discovered, such activity. This is true for all alleged downloads, but especially as to the thousands of third-party IP addresses as to which the Complaint fails to demonstrate Meta had any right of access or control.

And Plaintiffs cannot establish a plausible claim for contributory infringement by alleging that Meta could or should have discovered the infringement simply by better policing its internet service. The Ninth Circuit flatly rejected that notion in *Cobbler*. 901 F.3d at 1147–48 ("Cobbler Nevada's contributory infringement claim is premised on a bare allegation that Gonzales failed to police his internet service. This perfunctory allegation, without more, does not sufficiently link Gonzales to the alleged infringement.").

Plaintiffs also allege that they "informed Meta of the infringement, providing forensic evidence, and Meta still allowed it to continue." ¶ 167. To constitute effective notice, defendant must have "sufficient information to be able to find the specific infringing content on its system." *Waterman v. TikTok, Inc.*, 2024 WL 5413655, at *3 (C.D. Cal. Oct. 30, 2024). But the Complaint does not identify what "evidence" Plaintiffs provided, a single torrent that occurred after the date of this notice, or how the "evidence" Plaintiffs provided might have enabled Meta to find the torrenting instances they allege. Plaintiffs do not even allege facts to show that the information actually resides on Meta systems to be found. This, too, warrants dismissal. *Id.* (dismissing contributory infringement claim where Plaintiff "failed to plead any facts relating to when the takedown notices were sent, … what information was included in the notices, and any other facts that suggest [Plaintiff] provided [Defendant] with sufficient information to be able to locate the specific infringing content on its system").

In short, the Complaint does not plausibly establish that Meta was either aware of, or willfully blind, to the alleged infringement of their Works by the unidentified users of 47 Meta IP addresses and more than 2,500 third-party IP addresses. Their conclusory allegation to the contrary (¶ 166) does not suffice. *YZ Prods. v. Redbubble*, 545 F. Supp. 3d 756, 764 (N.D. Cal. 2021)

(allegations that defendant had "specific knowledge of" infringement "through Defendant's system" too conclusory to state a claim).

### 2. Plaintiffs fail to plausibly allege that Meta materially contributed to or induced any infringement

Even if Plaintiffs could establish the knowledge element (and they cannot), dismissal of their contributory infringement claim would still be warranted because the Complaint fails to plead that Meta "either (a) materially contribute[d] to or (b) induce[d] th[e] infringement" at issue. *VHT*, 918 F.3d at 745.

**No Material Contribution**:  "[A] computer system operation is liable under a material contribution theory of infringement 'if it has actual knowledge that specific infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works yet continues to provide access to infringing works.'" *Waterman*, 2024 WL 5413655, at *4 (quoting *Giganews*, 847 F.3d at 671).  Where there are "no simple measures available to remove infringing material," the material contribution element is not satisfied. *Giganews*, 847 F.3d at 671.

Here, Plaintiffs do not identify any specific, simple measures that Meta could have taken to prevent (or even find) the alleged infringers or their torrent activity.  They do not even plead facts to establish that the material in question is on Meta's systems in the first place.  Instead, Plaintiffs assert merely that Meta should have taken unspecified "steps to stop the infringement" rather than "continuing to pay for and provide the tools" to enable it.  ¶ 171.  This does not suffice.

It is unclear what "tools" Plaintiffs are referring to in this allegation, but if Plaintiffs are suggesting Meta could have prevented the infringement by shutting off or monitoring internet access, the Ninth Circuit has rejected that proposition. *See Cobbler*, 901 F.3d at 1148–49 (alleged failure to "secure, police, and protect" an internet connection from infringement fails to state a plausible claim).

Meta provides an internet-based suite of services, which requires that tens of thousands of employees, contractors, vendors, etc. have access to the internet for their work.  Monitoring every file downloaded by any person using Meta's global network would be an extraordinarily complex and invasive undertaking, not a "simple measure" as required by Ninth Circuit precedent.

1    Moreover, the vast majority of Plaintiffs' claims rest on downloads from third-party IP addresses

2    over which Meta has no control, negating the existence of "simple measures"—or *any* measures—

3    to avoid the infringement at issue.  This requires dismissal.  *See Waterman*, 2024 WL 5413655, at

4    *4 (dismissing contributory infringement claim where plaintiff "allege[d] no facts … that

5    Defendant was able to use simple measures to remove the infringing material from its platform").

6            There is another reason contributory liability cannot be premised on Meta "providing access

7    to its servers, data centers, IP addresses, computers, networks, accounts, and other tools."  ¶ 165.

8    The Supreme Court has held that "liability for another's infringement cannot arise from the mere

9    distribution of a product that is 'widely used for legitimate, non-infringing purposes.'"  *Cobbler*,

10   901 F.3d at 1148 (citing *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 442 (1984)).

11   *Cobbler* extended that rationale, finding that a company's providing internet access to its employees

12   and visitors cannot support a claim for contributory liability.  *Id.* at 1149 (affirming the dismissal

13   of contributory infringement claim and reasoning: "Providing internet access can hardly be said to

14   be distributing a product or service that is not 'capable of substantial' or 'commercially significant

15   noninfringing uses'").  Because internet access is, in effect, the only "material contribution" Meta

16   is alleged to have provided, dismissal is appropriate for this additional reason.

17           **No Inducement:** Plaintiffs' inducement theory is even weaker, and plainly insufficient to

18   state a claim.  "Inducement liability requires evidence of 'active steps ... taken to encourage direct

19   infringement."  *VHT*, 918 F.3d at 745 (quoting *Grokster*, 545 U.S. at 936).  Evidence of active steps

20   includes "advertising an infringing use or instructing how to engage in an infringing use," because

21   such evidence "show[s] an affirmative intent that the product be used to infringe."  *Id.* at 745–46;

22   *see also Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013)

23   (inducement liability requires "an object of promoting [the product's] use to infringe copyright").

24   The "improper object" of infringement "must be plain and must be affirmatively communicated

25   through words or actions[.]"  *Fung*, 710 F.3d at 1034.  "[F]ailure to take affirmative steps to prevent

26   infringement alone cannot trigger inducement liability."  *VHT*, 918 F.3d at 746.

27           Here, Plaintiffs assert that Meta induced the alleged infringement "by its agents, employees

28   and contractors by paying … [them] to obtain content for its AI training and providing access to its

1    servers, data centers, IP addresses, computers, networks, accounts, and other tools to facilitate the

2    infringement." ¶ 165. But the Complaint provides no basis to infer that any user of Meta's

3    corporate IP addresses or the 2,500+ third-party IP addresses was asked or paid by Meta to collect

4    Plaintiffs' Works, or any of the other allegedly torrented content identified in the exhibits to the

5    Complaint. To the contrary, for the many reasons discussed above, those downloads are consistent

6    only with personal usage, not coordinated action by Meta employees and contractors for AI training.

7          Plaintiffs' complaint is also devoid of allegations that Meta took any other "active steps" to

8    encourage infringement. Unlike in *Grokster*, where the defendants' "unlawful objective [was]

9    unmistakable," 545 U.S. at 940, Plaintiffs fail to plausibly plead any instances of Meta encouraging

10   employees and contractors to download adult content, much less Plaintiffs' Works, for any purpose.

11   Plaintiffs' theory of contributory liability—like its claims for direct and vicarious liability—are

12   implausible, unsupported, and insufficient to state any claim against Meta.

13   **V.    CONCLUSION**

14         The Complaint fails to state facts sufficient to state a claim against Meta for direct,

15   vicarious, or contributory copyright liability. And these claims fail not only for lack of supporting

16   facts, but also because Plaintiffs' theory of liability makes no sense and cannot be reconciled with

17   the facts they do plead. The entire complaint against Meta should be dismissed with prejudice.

18

19   Dated: October 27, 2025              CLEARY GOTTLIEB STEEN & HAMILTON LLP

20

21                                        /s/ Angela L. Dunning
                                          Angela L. Dunning
22

23                                        Attorneys for Defendant
                                          META PLATFORMS, INC.

24

25

26

27

28