Trey D. Brown (SBN 314469)
In-House Counsel
Strike 3 Holdings, LLC
11271 Ventura Blvd., Ste. 717
Los Angeles, CA 91604
Telephone:    (323) 347-4271
Email: trey@strike3holdings.com

Christian W. Waugh (FL SBN 71093)
WAUGH PLLC
201 E. Pine Street, Ste. 315
Orlando, FL 32801
Telephone:    (321) 800-6008
Email: cwaugh@waugh.legal

Jeremy J. Thompson (MN SBN 402173)
The Law Office of Jeremy J. Thompson PLLC
5200 Wilson Road, Ste. 150
Edina, MN 55424
Telephone:    (952) 952-1883
Email: jeremy@jthompson.law

Lincoln D. Bandlow, Esq. (SBN 170449)
Law Offices of Lincoln Bandlow, PC
1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Telephone:    (310) 556-9680
Email: Lincoln@BandlowLaw.com

Attorneys for Plaintiffs
STRIKE 3 HOLDINGS, LLC
COUNTERLIFE MEDIA, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware limited liability company, and COUNTERLIFE MEDIA, LLC, a Delaware limited liability company,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>　　　　Defendant. | Case Number: 5:25-cv-06213-EKL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>Date:  January 21, 2026<br>Time:  10:00 a.m.<br>Ctrm:  7<br><br>Judge:  Hon. Eumi K. Lee |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ....................................................................................................................2

    A.    Meta's Orchestrated Infringement of Plaintiffs' Copyrights Across Diverse and Widespread IP Addresses to Train Its AI.........................................................2

    B.    Meta's Claim That Infringements Were for Personal Use Is Unavailing ..............4

    C.    Plaintiffs Have the Right to Protect Their Creative Works .....................................5

III.  LEGAL STANDARD .............................................................................................5

IV.   ARGUMENT ..........................................................................................................6

    A.  Plaintiffs State a Plausible Claim for Direct Infringement Against Meta...................6

        1.    Plaintiffs' Allegations Surpass the *Cobbler* Standard................................7

        2.    The "Personal Use" Defense Does Not Render Plaintiffs' Claims Implausible.............................................................................................. 10

        3.    Meta's Volitional Conduct Arguments Are Misplaced .......................... 14

    B.  Plaintiffs Have Stated Plausible Claims for Secondary Liability .............................17

        1.    Meta is Liable for Its Agents' Vicarious Infringement............................17

            a.    Meta Had Adequate Control Over Its Agents                        17

            b.    Meta's Financial Interest in Training Its AI Is Undeniable        19

        2.    Meta Is Also Liable for Its Agents' Contributory Infringement..............20

            a.    Meta Knew of or Remained Willfully Blind to Thousands of Infringements                                                         21

            b.    Meta Materially Contributed to and Encouraged Its Agents' Infringement                                                          22

V.    CONCLUSION.......................................................................................................25

ii

## TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001 ...................... 6, 19, 20, 21, 24

*al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009) ................................................................. 15

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014).................................................... 14

*Arthur J. Gallagher & Co. v. Lang*, 2014 WL 4354670 (N.D. Cal. 2014).................................. 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 5, 6, 15, 25

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) ............................................ 7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 5, 6, 14, 15

*Clark v. Nordic Nats., Inc.*, 2025 WL 1592676 (N.D. Cal. June 5, 2025).................................. 6

*Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018) ........................... 7, 22, 23, 24

*Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1487988 (N.D. Cal. Mar. 26, 2025) ..... 21

*Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309 (S.D. Cal. Mar. 24, 2021)................................ 12

*Desoucy v. Cnty. of San Bernardino*, 2024 WL 3064089 (C.D. Cal. May 9, 2024).................... 15

*Doe v. Regents of Univ. of California*, 23 F.4th 930 (9th Cir. 2022)............................................ 6

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ....................................... 19, 20, 23

*Erickson Prods., Inc. v. Kast*, 921 F.3d 822 (9th Cir. 2019)................................................. 20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .................................................. 6

*Finjan, Inc. v. Bitdefender Inc.*, 2018 WL 1811979 (N.D. Cal. 2018) ........................................ 10

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)......................... 17, 19, 20, 24

*Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033 (9th Cir. 2018)......................................... 5

*Headhunter, LLC v. Castillo*, 2018 WL 333199 (W.D. Wash. Jan. 9, 2018) ................................ 8

iii

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003)..................................................... 21

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013)..................................... 11

*In re Google Generative AI Copyright Litig.*, 2025 WL 2624885
    (N.D. Cal. Sept. 11, 2025)................................................................................................. 15, 17

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025)......................... 3, 4, 7, 8

*Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. Apr. 15, 2022)..................................... 10

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) .................................................. 21

*Locklin v. StriVectin Operating Company, Inc.*, 2022 WL 867248 (N.D. Cal. Mar. 23, 2022) ... 15

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098 (N.D. Cal. 2008)....... 21

*Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068 (9th Cir. 2013).............................. 21, 23

*Menzel v. Scholastic, Inc.*, 2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ................................. 16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ............. 17, 18, 23, 24

*ML Products v. Ninestar Technology Co.*, 2023 WL 12171006 (C.D. Cal. Sept. 27, 2023)........ 10

*Mon Cheri Bridals, LLC v. Cloudflare, Inc.*, 2021 WL 4572015 (N.D. Cal. Oct. 6, 2021) ......... 22

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................................. 10

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ...................................................................... 15

*Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ................................. 17, 20, 22

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....................................... 17

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) ...................................... 6, 14, 23

*Rams v. Def Jam Recordings, Inc.*, 202 F. Supp. 3d 376 (S.D.N.Y. 2016) ............................... 20

*Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058 (9th Cir. 2025) .......................... 18, 19, 24

*Religious Tech. Ctr. v. Netcom Online Communication Servs., Inc.*, 907 F.Supp. 1361

iv

(N.D. Cal. 1995) ......................................................................................... 23

*Robinson v. Binello*, 771 F. Supp. 3d 1114 (N.D. Cal. 2025) ................................ 19, 20

*Sandisk Corp. v. IPValue Mgmt., Inc.*, 2025 WL 2838945 (N.D. Cal. Oct. 7, 2025) ................. 11

*Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872 (N.D. Cal. 2023) ............................ 25

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ................ 1, 24

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ............................................... 11

*Strike 3 Holdings, LLC v. Andaya*, 2021 WL 5123643 (N.D. Cal. Nov. 4, 2021) ................. 8

*Strike 3 Holdings, LLC v. Doe*, 2022 WL 3137935 (N.D. Cal. June 27, 2022) ................... 14

*Strike 3 Holdings, LLC v. Doe*, 2024 WL 3369986 (E.D.N.Y. July 11, 2024) .................... 13

*Strike 3 Holdings, LLC v. Doe*, 2024 WL 4467590 (C.D. Cal. Aug. 1, 2024) ..................... 8

*Strike 3 Holdings, LLC v. Doe*, 2025 WL 2042222 (N.D. Cal. July 21, 2025) .................... 9

*Strike 3 Holdings, LLC v. Doe*, 2025 WL 2309020 (S.D. Cal. July 3, 2025) ..................... 14

*Strike 3 Holdings, LLC v. Doe*, 370 F. Supp. 3d 478 (E.D. Pa. 2019) .......................... 5

*Strike 3 Holdings, LLC v. Lim*, 2022 WL 3137937 (N.D. Cal. Mar. 31, 2022) .................... 14

*Strike 3 Holdings, LLC v. Vokoun*, 2022 WL 310201 (D.N.J. 2022) .............................. 8

*Sylabs, Inc. v. Rose*, 2024 WL 2059716 (N.D. Cal. May 8, 2024) ............................... 15

*Tan v. Quick Box, LLC*, 2021 WL 1293862 (S.D. Cal. Apr. 7, 2021) ............................ 11

*UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408 (N.D. Cal. 2004) .................... 21

*United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938 (N.D. Cal. 2021) ........... 12

*VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019) ............................... 14

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

**Statutes**

17 U.S.C. § 410(c) ................................................................................................ 6

17 U.S.C. § 501(a) .............................................................................................. 14

17 U.S.C. §§ 106(1), (3) ...................................................................................... 6

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 15

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 15

Fed. R. Civ. P. 8(e) ............................................................................................. 10

Fed. R. Civ. P. 9(b) ............................................................................................. 21

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Strike 3 Holdings, LLC ("Strike 3") and Counterlife Media, LLC ("Counterlife") hereby submit the following Opposition to the Motion to Dismiss Complaint for Copyright Infringement ("Motion") filed by Defendant Meta Platform Inc. ("Meta"). D.E. 34.

## I.    INTRODUCTION

Meta's "the ends justify the means" approach to developing artificial intelligence ("AI") is made at the expense of others' copyrights. These rights "motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to [their] products . . . ." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). While this is balanced against "society's competing interest in the free flow of ideas," *id.* at 430, that does not mean authors lose their rights every time a new technology emerges. Plaintiffs seek to protect their creative works, not just from their unauthorized use in Meta's AI, but from Meta's illegal reproduction and distribution of those works over the BitTorrent network.

The Complaint states claims for both direct and secondary infringement. The direct claim is well-plead and surpasses the *Cobbler* standard. Plaintiffs not only connect Meta to the infringement by its IP addresses, but through other connections including "Off-Infra" accounts, examples of residential use of BitTorrent, as well as parallels to past infringements revealed in other cases. In fact, Plaintiffs provide data demonstrating unique patterns of Meta's piracy suggestive of a centralized algorithm coordinating the infringements. Meta's excuse that employees must be infringing Plaintiffs' copyrights for "personal use" does not fit the facts.

The Complaint also states claims for vicarious and contributory liability. For the former, Meta has the ability to control its employees' and agents' infringement. Indeed, Meta supplied its employees with the script for doing so. Meta also has a substantial financial interest in using Plaintiffs' works to develop its AI as well as to use those works to maintain its position in BitTorrent swarms so that it can efficiently download other works to train its AI. For the latter, Meta was aware of the violations to Plaintiffs' copyrights. Meta materially contributed to these

1

violations by not only supplying the passive technology to access the BitTorrent network, but by actively incentivizing the infringement by hiring teams to do so and supplying them with scripts to pirate works *en masse*. As a result of these allegations, the Court should deny Meta's Motion.

## II.    FACTS

### A.    Meta's Orchestrated Infringement of Plaintiffs' Copyrights Across Diverse and Widespread IP Addresses to Train Its AI

Meta, one of the largest companies in the world, is caught in a high-tech arms race for market dominance over the next big AI model. It is losing. To make up lost ground, Meta pirated countless creative works from Plaintiffs and others to train its AI. This was done using the BitTorrent protocol. D.E. 1, at ¶5. Meta relied on BitTorrent–and not other download protocols– due to BitTorrent's ability to transfer large files quickly and anonymously. *Id.* at ¶¶61–62. These efficiencies, however, come at a cost.

Because it relies on a decentralized network of peers to exchange files, BitTorrent does not just download files, it also uploads them. In fact, it has a "reciprocal, 'tit-for-tat' mechanism" that incentivizes peers to continuously upload files by rewarding high volumes of uploads with faster download speeds. *See id.* at ¶¶8, 113. Meta does not produce popular creative works and thus has no "currency" for the swarm of peers in the BitTorrent network. *Id.* at ¶84. As a result, Meta must steal someone else's cachet to stay in these swarms so that it can download files.

Plaintiffs' works are ideal. Not only do they serve as unique data for AI training, *id.* at ¶¶134–40, they are popular both commercially and in the BitTorrent network, ensuring that Meta could stay in swarms and download even more files. Despite its best efforts to conceal its piracy, Plaintiffs' scanning software, *see id.* at ¶¶71–90, uncovered that Meta infringed at least 2,396 of their motion pictures, D.E. 1-1 (Ex. D)—essentially their entire filmography. *See* D.E. 1, at ¶108. This includes "well over 100,000 unauthorized distribution[s]" of Plaintiffs' copyrighted works recorded and documented in packet capture "PCAP" files. *Id.* at ¶80. The infringing IP addresses traced back directly to Meta's offices or to entities associated with Meta.

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

*Corporate IPs.* These infringements are straightforward. Plaintiffs recorded forty-seven unique IP addresses uploading their works to the BitTorrent network. D.E. 1-1 (Ex. A) (listing IP addresses). Those IP addresses traced back to various Meta offices. D.E. 1 at ¶¶57–60. That is, infringement of Plaintiffs' works from the Corporate IPs took place inside Meta's walls.

*Off-Infra IPs.* Infringements utilizing "off-infrastructure" IP addresses are more insidious yet even more damaging as they show to what lengths Meta went to conceal its BitTorrent activity. Their existence is not mere speculation: Meta employees have admitted to "off-infra" infringement efforts in *Kadrey v. Meta Platforms, Inc.*, No. 23-3417 (N.D. Cal.). *See id.* at ¶¶90–91. By comparing patterns of BitTorrent activity from the known Corporate IPs to broader data recorded from Plaintiffs' Cross-Reference Tool, Plaintiffs uncovered Meta's hidden IP addresses "acting in conjunction with" its Corporate IPs to pirate works from BitTorrent. *Id.* at ¶¶93–97. Of the eight groups of infringing IP addresses, seven trace back to off-sight datacenters (Ranges A–G), and one to a residential address (Residence #1). *Id.* at ¶¶97–100. Indeed, the Off-Infra IPs in Ranges A–F appear to correlate with virtual private clouds ("VPC")–a software used to "hide" IP addresses, making them more difficult to trace–Meta's employees also admitted to configuring in *Kadrey*. *Id.* at ¶¶92, 98.

*Residential IP.* Also taking place beyond Meta's walls was BitTorrent infringement from a remote employee's (or agent's) residence. While the application to seal portions of that pleading remains pending, Plaintiffs caught an individual associated with Meta infringing more of its works in its anti-piracy litigation. *Id.* at ¶¶103–107. This individual was an automation engineer that can reasonably be inferred to have worked with Meta's AI division. *See id.*

Any one of these categories would be actionable infringement alone, but what is significant is the patterns that emerge when comparing all their BitTorrent activity together. Plaintiffs' data shows evidence of "centrally driven . . . sophisticated algorithms and scripts," used by these IP addresses to scour for files on the BitTorrent network to download. *Id.* at ¶101. The downloads do not behave like a human who may search for files on a subject. Instead, the

1   infringements perform exhaustive, systematic, and hyper-literal searches of strings of data to

2   acquire any file containing even a single keyword, even if it is not semantically related to the

3   subject. *Infra* § IV.A.2. (discussing examples). These bizarre patterns not only indicate the use

4   of a universal "script" (likely developed, supplied, or encouraged by Meta), but also show that

5   the BitTorrent downloads are "for AI training data and not for personal use." *See* D.E. 1, at ¶102.

6            **B.      Meta's Claim That Infringements Were for Personal Use Is Unavailing**

7            Instead of dealing with the pleadings head on, Meta proposes its own factual universe,

8   one in which its infringement is not only denied, but deflected as "personal use." This ignores

9   the parallels between this matter and *Kadrey*. In *Kadrey*, Meta admitted to using BitTorrent to

10  obtain digital copies for the *Kadrey* plaintiffs' works for AI training purposes. D.E. 1, at ¶53.

11  Variations of those same files were detected by Plaintiffs' technology as being infringed from

12  Meta's Corporate IPs—the very same IPs used to infringe Plaintiffs' works. *See* D.E. 1-1 (Ex.

13  B, lns. 4381, 4695, & 4835).

14           Additionally, Meta also testified in *Kadrey* that it intentionally used six hidden VPCs to

15  mask its Corporate IPs to prevent detection of its BitTorrent activity. *See* D.E. 1, at ¶¶92, 98.

16  Plaintiffs were able to correlate Meta's infringement through its Corporate IPs to six hidden data

17  centers that were used to engage in massive infringement of both Plaintiffs' and the *Kadrey*

18  plaintiffs' works as well. *See* D.E. 1-1 (Exs. B & C). The scale of these infringements is

19  staggering and are "beyond what a human could consume." D.E. 1, at ¶¶94(a), 133. And the

20  activity from those same Off-Infra IPs was similar to activity Plaintiffs recorded from Meta's

21  Corporate IPs, showing they all acted in concert to the same ends. *Id.* at ¶¶94, 101. Those ends,

22  as revealed in *Kadrey*, were to train Meta's AI and not for the personal use of its employees.

23  Thus, like the books in *Kadrey*, it is reasonable to infer that Meta pirated Plaintiffs' works to

24  train its AI.

25

26

27

28

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

1

### C.    Plaintiffs Have the Right to Protect Their Creative Works

2    Meta leans into *ad hominem* attacks against Plaintiffs as if that diminishes their rights to

3    protect their works. This ignores the Ninth Circuit's admonition that "individual cases . . .

4    deserve to be judged on their own merits and not saddled with a blanket indictment against peer-

5    to-peer copyright litigation." *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1038 (9th

6    Cir. 2018). Meta "provide[s] no support for the conclusory statement that Strike 3 is a 'copyright

7    troll,' that is, 'a non-producer [of the copyrighted work at issue] who merely has acquired the

8    right to bring lawsuits against alleged infringers.'" *Strike 3 Holdings, LLC v. Doe*, 370 F. Supp.

9    3d 478, 481 (E.D. Pa. 2019) (citation omitted).

10    Rather, "Strike 3 [and Counterlife are] part of a group of corporate entities that actually

11    produce[] the motion pictures at issue and which own[] valid copyrights to those works." *See*

12    *Strike 3*, 370 F. Supp. 3d at 481–82. "Where, as here, a plaintiff alleges that it is the victim of

13    copyright infringement on a massive scale, the mere fact that it has filed a significant number of

14    lawsuits is not a valid basis on which to impute an improper purpose." *Id.*

15    None of this is a defense to Meta's infringement.

16    ## III.    LEGAL STANDARD

17    Dismissal is appropriate "only if it appears beyond doubt that [the] plaintiff can prove no

18    set of facts in support of its claims which would entitle it to relief." *Id.* (citation omitted). "To

19    survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

20    'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

21    (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

22    plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

23    inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.

24    at 566).

25    While it may disregard legal conclusions, the Court must "accept as true all well-pleaded

26    factual allegations and draw all reasonable inferences in favor of the plaintiff." *Doe v. Regents*

27

28

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

*of Univ. of California*, 23 F.4th 930, 935 (9th Cir. 2022) (citation omitted). "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 678–79. The standard is an inherently liberal one, such that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). "If the court finds that dismissal . . . is warranted, the 'court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Clark v. Nordic Nats., Inc.*, 2025 WL 1592676, at *1 (N.D. Cal. June 5, 2025) (citations omitted).

## IV.    ARGUMENT

### A.    Plaintiffs State a Plausible Claim for Direct Infringement Against Meta

Infringement from Meta's Corporate IPs, Off-Infra IPs, and Residential IP are just as unlawful as those committed by individuals in any other BitTorrent matter. Direct copyright infringement requires: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citation omitted). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights' described in § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (citation omitted). In addition, Plaintiffs must show (3) "causation (also referred to as 'volitional conduct') by the defendant." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (citation omitted).

Meta does not contest Plaintiffs' ownership of the various copyrights listed in the Complaint. D.E. 1, at ¶108; D.E. 1-1 (Ex. D); *see* 17 U.S.C. § 410(c) ("[C]ertificate[s] . . . constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). It also does not challenge whether Plaintiffs' works were "copied," that is, downloaded (reproduced) and uploaded (distributed), *see* 17 U.S.C. §§ 106(1), (3), from and to

6

peers in the BitTorrent network. D.E. 1, at ¶¶147–49. Nor does it contest that such copying is actionable. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025); *see also Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1041 (N.D. Cal. 2025) (observing, on summary judgment, that "[t]here is no dispute that Meta torrented LibGen and Anna's Archive"). Instead, Meta contends that Plaintiffs insufficiently rely on Meta's "status as the registered subscriber of an infringing IP address[.]" D.E. 34, at 13 (quoting *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018)).

This is mistaken.

### 1.    Plaintiffs' Allegations Surpass the *Cobbler* Standard

Plaintiffs have alleged "something more" than Meta's ownership of the IP addresses to connect it to the infringements.  In *Cobbler*, the Ninth Circuit affirmed the trial court's dismissal for failure to state a claim, holding that "status as the registered subscriber of an infringing IP address, *standing alone*, does not create a reasonable inference that he is also the infringer." 901 F.3d at 1145 (emphasis added). That is, a party's connection to an IP address "solves only part of the puzzle" which is why "[a] plaintiff must allege something more to create a reasonable inference that a subscriber is also an infringer." *Id.*

The Complaint alleges "something more" than what was alleged in *Cobbler*: at least forty-seven unique Corporate IPs owned by Meta infringed Plaintiffs' copyrights. D.E. 1, at ¶56; D.E. 1-1 (Ex. A). The scale alone of the IP addresses supports the reasonable inference that Meta, and not a rogue employee, pirated the works for corporate purposes.  The data also shows that Meta distributed Plaintiffs' works for extended periods of time across different Corporate IPs. *See*, *e.g.*, D.E. 101 (Ex. A, lns. 36–37) (showing the same movie file being torrented across two Corporate IPs between December 27, 2019 and January 6, 2020). This consistent duration makes it unlikely that a guest or rogue employee infringed Plaintiffs' works at Meta's offices.

Likewise, Exhibit G outlines over 1,000 examples of Meta distributing Plaintiffs' movies for at least three full days after acquiring the full copy of the movie. D.E. 1, at ¶116, D.E. 1-1

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

1  (Ex. G). Meta paints the infringement through its Corporate IPs as "isolated," D.E. 34, at 18, but

2  the reality is that "[m]any of the IP addresses listed on Exhibit A continued unauthorized

3  distribution of multiple other Works owned by Plaintiffs over several years." D.E. 1, at ¶57.

4      Courts have held that *Cobbler* is satisfied when a plaintiff alleges that "the same IP

5  address was used to download and distribute [thousands of] mainstream media, suggesting that

6  the infringer likely is a permanent resident at the identified address," and when a plaintiff

7  "alleges that [a defendant] is the infringer based on its investigation of . . . publicly available

8  information indicating a connection between [the defendant's] interests . . . and other materials

9  downloaded and distributed using the same IP address." *Strike 3 Holdings, LLC v. Andaya*, 2021

10  WL 5123643, at *4 (N.D. Cal. Nov. 4, 2021); *see also Headhunter, LLC v. Castillo*, 2018 WL

11  333199, at *2 (W.D. Wash. Jan. 9, 2018) (holding "the volume, titles, and persistent BitTorrent

12  activity . . . indicated [the defendants] were either the primary subscriber or someone residing

13  with the primary subscriber and an authorized user, and not a transitory or occasional guest").

14      Exhibit B shows Meta infringing nearly 5,000 third-party files consistent with the

15  "massive amounts" of data required for AI training by Meta. D.E. 1-1 (Ex. B). It further shows

16  files that Meta admitted it infringed in *Kadrey* through Meta's Corporate IPs in the same

17  timeframe Plaintiffs' works were infringed through those Corporate IPs. *See id.* at lns. 4,381 &

18  4,835; *Kadrey*, 788 F. Supp. 3d at 1041; *see also Strike 3 Holdings, LLC v. Doe*, 2024 WL

19  4467590, at *2 (C.D. Cal. Aug. 1, 2024) (holding Strike 3 alleged "something more" when third-

20  party infringement connections were made to a defendant's profession); *Strike 3 Holdings, LLC*

21  *v. Vokoun*, 2022 WL 310201, at *3 (D.N.J. 2022) (granting default judgment and holding that

22  Plaintiff "has made a prima facie showing that Defendant is indeed the infringer" where it alleged

23  "matches between Defendant's professional expertise and software that was downloaded and

24  distributed using the same IP address during the period of infringement").

25      The Off-Infra IPs form an even more encompassing connection between Meta and the

26  infringement. While Meta used hidden data centers to conceal its BitTorrent activities, Plaintiffs

27

28

8

uncovered evidence that the Off-Infra IPs operated "in conjunction with Meta's corporate IP addresses all of which [were] centrally driven by sophisticated algorithms and scripts." D.E. 1, at ¶101. Indeed, Meta has previously admitted to obtaining unauthorized content through BitTorrent for corporate purposes through hidden methods. *Id.* at ¶¶90–91. These connections are summarized in Plaintiffs' Complaint. *See* D.E. 1-1 (Exs. B & C) (containing data).

> a. Similar patterns involving mass infringement beyond what a human could consume;
> b. Similar methodical downloads of disparate content based on the patterns shown by Meta's corporate IP addresses;
> c. Similar content being downloaded on the same day or at or near the same time as on Meta's corporate IP addresses;
> d. Similar targeting of certain types of content featuring specific languages at or around the same date and time that followed a shifting pattern (i.e. IP addresses that targeted French language versions of TV shows or films on the same day as Meta's corporate IP addresses, and then shifted in apparent connection with Meta's corporate IP addresses to target Russian language versions of TV shows); and
> e. Correlations to Meta's corporate IP addresses where the same content is being torrented in different resolutions at or around the same time.

D.E. 1, at ¶97. Even stitching together evidence from anonymized IP addresses and hidden data centers, these connections between the Corporate IPs and Off-Infra IPs are plausible, as is the claim against Meta. *See Strike 3 Holdings, LLC v. Doe*, 2025 WL 2042222, at *2 (N.D. Cal. July 21, 2025) (granting default judgment and noting that "[w]hile Strike 3's investigation was not exhaustive, it reflects what could reasonably be uncovered without the benefit of discovery").

Finally, the Residential IP that infringed Plaintiffs' works at Meta's direction also meets the *Cobbler* standard. Meta deflects that there is no "basis to presume that the contractor's work as an 'automation engineer' included sourcing AI training data." D.E. 34, at 15. But it is plausible that an "automation engineer" is involved in automating the data collection process for training datasets. This same contractor also publicly lists his professional skillsets as "machine learning" and "data centers." D.E. 1, at ¶¶ 105–6. This is the type of contractor Meta would hire to automate downloads of "massive amounts" of data needed to train AI. *See* D.E. 34, at 7. And, the infringement stopped when the contractor's term ended, suggesting the infringement was linked to the contractor's work with Meta. D.E. 1, at ¶¶105–6. Several months later, after this

9

1   contractor's father was sued for BitTorrent infringement, the contractor was hired as an

2   employee at Meta's "Reality Labs." *Id*. Ultimately, the conduct of Meta's contractor plausibly

3   supports the allegations in Plaintiffs' Complaint.

4       Any one of these classes of infringement–from the Corporate IPs, Off-Infra IPs, or

5   Residential IP–can stand on its own, but especially when taken together, states a plausible claim

6   against Meta for widespread piracy. Defendant's attempts to sequester the infringements and

7   divide-and-conquer each allegation separately are improper. The Federal Rules require that the

8   "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), and "the complaint

9   should be read as a whole, not parsed piece by piece to determine whether each allegation, in

10  isolation, is plausible." *Arthur J. Gallagher & Co. v. Lang*, 2014 WL 4354670, at *3 (N.D. Cal.

11  2014) (citation omitted); *see also Finjan, Inc. v. Bitdefender Inc*., 2018 WL 1811979, at *2 (N.D.

12  Cal. 2018) ("A reasonable inference is one that is plausible and flows logically from the facts

13  alleged[.]"). Thus, the Complaint alleges "something more" against Meta connecting it to

14  thousands of infringements of Plaintiffs' copyrights.

### 2.    The "Personal Use" Defense Does Not Render Plaintiffs' Claims Implausible

17      Meta proposes an affirmative defense: the only theory that supposedly "fits the facts" is

18  that infringement was done for "personal use" by employees or guests, rendering Plaintiffs'

19  claims "implausible." D.E. 34, at 14. Yet, "[t]here is no requirement, at the pleading stage, that

20  [Plaintiffs] disprove any alternate or 'innocent' explanation where the . . . allegations are

21  plausible." *ML Products v. Ninestar Technology Co*., 2023 WL 12171006, at *8 (C.D. Cal. Sept.

22  27, 2023). More troubling, Meta's defense "shows only what could occur in theory—not what

23  occurred in fact." *Kong v. Trader Joe's Co*., 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022).

24      Meta's approach turns a Rule 12(b)(6) challenge on its head.  For the Court to find

25  Plaintiffs' allegations implausible based on Meta's defense, it would have to ignore Plaintiffs'

26  well-plead allegations and accept Meta's version of the facts. *See Nat'l Rifle Ass'n of Am. v.*

27  *Vullo*, 602 U.S. 175, 195 (2024) (rejecting proffered "obvious alternative explanation"). Meta's

28

10

1  defense is "better suited to a motion for summary judgment when the record is more fully

2  developed." *Tan v. Quick Box, LLC*, 2021 WL 1293862, at *15 (S.D. Cal. Apr. 7, 2021).

3      The Complaint "may be dismissed only when defendant's plausible alternative

4  explanation is so convincing that [Plaintiffs'] explanation is *im*plausible. The standard at this

5  stage of the litigation is not that [Plaintiffs'] explanation must be true or even probable." *Starr*

6  *v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (emphasis original). "If there are two alternative

7  explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

8  plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *In re Century*

9  *Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th Cir. 2013) (citing *Starr*, 652 F.3d t 1216–

10  17).

11      In a similar case, a patent holder brought an infringement action against Sandisk because

12  a research paper written by Sandisk engineers suggested patent infringement. *Sandisk Corp. v.*

13  *IPValue Mgmt., Inc.*, 2025 WL 2838945, at *2 (N.D. Cal. Oct. 7, 2025). Sandisk alleged an

14  "alternative theory," like Meta, that the research paper was for non-commercial related purposes

15  and failed to tie the company to the infringement. *Id*. Ultimately, the Court held the rightsholder's

16  claims were plausible because the paper provided circumstantial evidence linking Sandisk

17  engineers to the paper, thus linking the paper to a Sandisk product, hence the company itself. *Id.*

18      Likewise, Plaintiffs have linked Meta's employees to the infringement. D.E. 1, at ¶53

19  (Meta engineers admitting to identical BitTorrent activity of others content); *see id*. at ¶103

20  (Residential IP). Plaintiffs have linked the infringement to at least one Meta product, *id*. at ¶145,

21  and, presented evidence indicating that Meta's AI trains on adult content. *Id*. at ¶143. This is one

22  of many links connecting back to Meta, to say nothing of Plaintiffs' direct evidence. *See id.* at

23  ¶¶92–97. While some of these facts rely on circumstantial evidence, they are "sufficient to

24  plausibly infer that at least some of [Defendant's] products employ the methods." *Sandisk*, 2025

25  WL 2838945 at *2. Where, as here, a complaint "has crossed the line from possibility to

26

27                                    11

28

plausibility" Plaintiffs "need not rule out obvious alternative explanations." *United States v. Mariner Health Care, Inc*., 552 F. Supp. 3d 938, 949 (N.D. Cal. 2021).

The pleadings further undermines Meta's defense. "Allegations that 'tend to exclude the possibility' of a[n] explanation are enough to avoid dismissal, even if those allegations can't foreclose such explanations conclusively." *Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309, at *3 (S.D. Cal. Mar. 24, 2021). Exhibit B displays various infringements of third-party works from Meta's Corporate IPs, Off-Infra IPs, and Residential IP. *See* D.E. 1-1 (Ex. B). It demonstrates several instances of Meta's IP addresses infringing either a near identical file, or a file categorically related to a file on one of the VPCs, either on the same day, or within hours of each other. The content is diverse, including adult films, mainstream television shows, books, movies, software, anime, and more. *See id.*

For example, on June 29, 2024, the Residential IP infringed "Microsoft Office 2019 Pro Plus." *Id.* at ln. 3971. Only a few hours later, Meta's Corporate infringed "Microsoft Office 2016 Pro + Visio." *Id*. at ln. 3972. An hour after that, an Off-Infra IP infringed "Microsoft Office Pro Plus 2016." *Id*. at ln. 3973. Five minutes later, the Residential IP then infringed "Microsoft Office 2016 Pro Plus 16.0," then, a few hours later, "Microsoft Office 2007 SP3 Original," and another few hours later "Microsoft Office 2021 LTSC." *Id.* at lns. 3974–76.   No reasonable person needs this many versions of a word processing software. The Residential IP alone infringed four different versions released on four different years. *See also id.* at lns. 4263 & 4264 (similar example with "TVBOXNOW"). Instead, what examples like this show is a systematic enveloping of different software updates to train a program: Meta's AI. Meta's theory that random, unconnected individuals would want near identical and outdated software on the same day is implausible.

This is not an isolated coincidence. Another example can be seen on September 16, 2024. The Off-Infra IPs infringe "Real Housewives of Atlanta S13E16" and then "My Brilliant Friend S03E03." *Id.* at lns. 4426 & 4427. Within minutes, Meta's Corporate IPs then infringe "Real

Housewives of Atlanta S14E18" and then "My Brilliant Friend S04E01." *Id.* at lns. 4428 & 4429. The odds that infringements of two independent televisions series, being infringed on the same day, both of subsequent seasons, are nil. This evinces a centralized coordination of infringement across the IPs. Another telling example takes place on April 7, 2024. Crawling the web for the word "origin" a Corporate IP infringed book "Origin - Dan Brown," followed by Off-Infra IPs infringing a videogame "Origin Offline Start," and a movie "Origin (2023)." *Id.* at lns. 3562–64. There is no meaningful relationship between these works besides the presences of the string "origin" in their filenames. This is the kind of systematic, hyper-literal search consistent with an algorithm, and not just a person casually searching for files. Indeed, on November 13, 2024, the Corporate IPs and Off-Infra IPs did a sweep of file labeled "JUQ-928 2K," "JUQ-972," "JUQ-819," etc. with the search looking for each number in the set. *Id.* at lns. 4762–71; d*ee also id*. at lns. 3519–22 (showing infringement between Off-Infra IPs and Corporate IPs relating to puppies/dogs/barking); 4581-4584 (showing infringement between Meta corporate and VPCs relating to "ghosts").

Meta claims this is all "fabricated in an attempt to attribute to Meta isolated downloads of adult content by unknown third parties," D.E. 34, at 17, but the patterns support Plaintiffs' allegation of a sophisticated coordinated effort by Meta. Meta has incorporated this data into its pleadings to support its allegations of complex patterns revealed by this data. *See* D.E. 1, at ¶94 (summarizing various patterns). This also supports Plaintiffs' allegations that Meta targeted different file types of Plaintiffs' content for AI training to "understand the differences in resolution, encoding and camera capabilities." D.E. 1, at ¶138.

Nor are the infringements "sporadic," D.E. 34, at 15, since, as Exhibit B shows, the infringements are continuous and systematic. *See, e.g., Strike 3 Holdings, LLC v. Doe*, 2024 WL 3369986, at *2 (E.D.N.Y. July 11, 2024) (noting "consistent and prolonged history of BitTorrent activity indicates that the infringer is unlikely to be a houseguest or infrequent visitor"). Meta's injection of numerical arguments– the "rate" at which works were downloaded, its stock of

1  employees–besides being improper, also would impose a (prohibited) "probability requirement."

2  *See Twombly*, 550 U.S. at 556. Moreover, the amount of violations alleged is irrelevant to Meta's

3  ultimate liability. *See* D.E. 34, at 16–17. Even a single infringement is actionable. *See* 17 U.S.C.

4  § 501(a). The fact that AI needs to ingest lots of content does not make it any less likely that

5  Meta pirated Plaintiffs' works to obtain more data. If anything, it makes it more likely. As seen

6  by Plaintiffs' exhibits, Meta needs all types of content to train its AI models, no matter how

7  random or unique. Plaintiffs are just two of Meta's many victims.

8  ### 3.    Meta's Volitional Conduct Arguments Are Misplaced

9  Meta devotes unusual attention to volitional conduct even though "'most direct-

10  infringement cases' do not present this issue[.]" *Cf. VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723,

11  731 (9th Cir. 2019) (quoting *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 453, (2014)).

12  As Justice Scalia observed, this issue arises when a defendant "does nothing more than operate

13  an automated, user-controlled system," and liability must be parsed between "who selects the

14  copyrighted content: the defendant or its customers." *Aereo*, 573 U.S. at 454–55). "[V]olition

15  . . . does not really mean an act of willing or choosing or an act of deciding'; rather, 'it simply

16  stands for the unremarkable proposition that proximate causation historically underlines

17  copyright infringement liability no less than other torts.'" *VHT*, 918 F.3d at 731 (citing

18  *Giganews*, 847 F.3d at 666)).

19  In BitTorrent suits, "volitional conduct" generally requires only facts "that an actual

20  human was involved" in the infringement. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, 2025 WL

21  2309020, at *2 (S.D. Cal. July 3, 2025); *Strike 3 Holdings, LLC v. Lim*, 2022 WL 3137937, at

22  *2 (N.D. Cal. Mar. 31, 2022), *report and recommendation adopted sub nom. Strike 3 Holdings,*

23  *LLC v. Doe*, 2022 WL 3137935 (N.D. Cal. June 27, 2022) (granting default judgment when

24  Strike 3 had "sufficiently shown that [the defendant] caused the infringement because it was he

25  who downloaded and distributed the Works") (citations omitted). To this point, Meta raises no

26  challenge, but instead focuses on Plaintiffs' broader allegation that "Meta directed" its

27

28

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT

employees' and contractors' infringement. D.E. 34, at 16. While these arguments are not cognizable attacks under the volitional conduct rubric, Plaintiffs respond to them in general.

The pleadings merely require "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support Plaintiffs' claims. *Twombly*, 550 U.S. at 556. "*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry [Plaintiffs'] burden." *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009), *rev'd and remanded on other grounds*, 563 U.S. 731 (2011). A Rule 12(b)(6) challenge only "tests the legal sufficiency of a claim," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), and merits-disputes are left for discovery. "[A]t the motion to dismiss stage, complaints need not 'show' or 'establish' anything." *Locklin v. StriVectin Operating Company, Inc*., 2022 WL 867248, at *4 (N.D. Cal. Mar. 23, 2022) (citing *Iqbal*, 556 U.S. at 678).

The Complaint condenses down years of BitTorrent activity from thousands of infringements into "a short and plain statement," Fed. R. Civ. P. 8(a)(2), that puts Meta "on sufficient notice of the particular misconduct alleged . . . .'" *Sylabs, Inc. v. Rose*, 2024 WL 2059716, at *6 (N.D. Cal. May 8, 2024) (citation omitted). To the extent there may be explanatory gaps, this is not because the claims are implausible, but because Plaintiffs have not had the opportunity to prove their case. "At the pleading stage, particularly when the scope of the alleged infringement is wide-ranging and not precisely known, it is permissible to plead infringement of representative works." *See In re Google Generative AI Copyright Litig.*, 2025 WL 2624885, at *6 (N.D. Cal. Sept. 11, 2025) (collecting cases).

Meta does not like Plaintiffs' references to its misconduct in *Kadrey* because past infringement does not guarantee similar results. *See* D.E. 34, at 19–20. But references to that case are not used for mere propensity, but rather to support the plausibility of the facts alleged in the Complaint. *See Desoucy v. Cnty. of San Bernardino*, 2024 WL 3064089, at *10 (C.D. Cal. May 9, 2024) (accepting facts from "past cases" to support plausibility). The case Meta relies upon is inapposite as it concerned allegations of infringement in which the Scholastic "exceeded

15

licenses given by *other* individuals" which "does not make it plausible that Scholastic has done the same with respect to Mr. Menzel." *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *3 (N.D. Cal. Mar. 19, 2018) (emphasis original). Relatedly, Defendant's contention that "Meta did not "beg[i]n researching *any [video-generating] model* of AI until 2022" is hairsplitting. D.E. 34, at 17 (emphasis added). Meta began research into AI as far back as 2013 under Facebook Artificial Intelligence Research. D.E. 1, at ¶37; *see id.* at ¶35 (rebranding as "Meta Platforms, Inc." in 2021). For example, then-Facebook released SlowFast in 2019 and Ego4D in 2021, which, though not video-generating, are trained on video data. *See id.* at ¶¶38–40. Regardless, when Meta actually began constructing its AI hardly excuses the infringements prior to 2022, and certainly does not explain away those that took place after.

Meta then introduces a red herring: that Plaintiffs do not allege which works were used to "train any of the 'various [] Meta AI Models[.]'" D.E. 34, at 17. Meta offers no authority for the proposition that Plaintiffs must trace, with specificity, the pedigree of each work. More importantly, this "secondary" use ignores Meta's primary infringements: downloading and uploading Plaintiffs' works to other peers in the BitTorrent network. While Meta denies that Plaintiffs' works were used to train its AI, *see* D.E. 34, at 18, black boxes of propriety data are no shield to litigation. Drawing all reasonable inferences in favor of Plaintiffs, it is plausible that Meta not only pirated the works, but used those copies to train its AI.

This is just as true for Meta's grievance that Plaintiffs do not specifically allege what "other content" Meta downloaded that benefited from the "faster download speeds" gained by distributing Plaintiffs' works. *See* D.E. 34, at 18. This does not diminish the claims' plausibility, nor do the pleadings require such evidence. "Plaintiff[s'] burden at the pleading stage is that of plausibility, not certainty." *See Strike 3 Holdings, LLC v. Doe*, 2019 WL 4745360, at *4 (D.N.J. Sept. 30, 2019) (citations omitted). Plaintiffs' claim is further supported by what Meta labels a "hodgepodge of duplicative, haphazard" infringements. *See* D.E. 34, at 18. If the goal is to create

16

a feedback loop of faster download speeds by transmitting greater data, then recording multiple and duplicate uploads of Plaintiffs' popular works is *exactly* what one would expect to observe.

Finally, Meta misreads the pleadings when arguing that none of the uploading "is alleged to have involved Meta IP addresses or even the residential IP address." D.E. 34, at 18. The opposite is true: *all of the data* in the pleadings are from Meta's various IP addresses uploads to infringement detection technology. *See* D.E. 1, at ¶¶76–80. To this, Meta asks "why . . . would [Meta] continue to openly use its own corporate IP addresses" if it intended to cover its tracks? *See* D.E. 34, at 19. But the Complaint does not have to answer for Meta's lapses of VPCs or judgement. Meta may do so in discovery.

**B.     Plaintiffs Have Stated Plausible Claims for Secondary Liability**

To the extent Meta shrugs off liability onto third-parties, it is nonetheless liable for vicarious and contributory infringement.

**1.     Meta is Liable for Its Agents' Vicarious Infringement**

"The concept of vicarious copyright liability was developed . . . as an outgrowth of the agency principles of respondeat superior." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261–62 (9th Cir. 1996); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (observing "secondary liability emerged from common law principles and are well established in the law") (collecting cases). In addition to direct liability, "to state a claim for vicarious copyright infringement, 'a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'" *In re Google*, 2025 WL 2624885 at *8 (quoting *Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) (citation omitted)). Plaintiffs have done so.

**a.     Meta Had Adequate Control Over Its Agents**

The first element requires Meta have "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). Meta does not dispute that, as "employees and agents,"

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

1  D.E. 1, at ¶169, Meta had the legal right to control the infringers. They are not ships passing in

2  the night; they work for Meta. This is classic *respondeat superior*.

3     Meta, instead, contests that it had the practical ability to control the infringement, and

4  that Plaintiffs failed to allege that "Meta was aware of the infringement". D.E. 34, at 21. First,

5  this is false on its face. "Plaintiffs informed Meta of the infringement, providing forensic

6  evidence, and Meta still allowed it to continue" up to the time Plaintiffs filed the Complaint.[1]

7  D.E. 1, at ¶¶131, 167. And at least as far back as July 7, 2023, when the complaint in *Kadrey*

8  was filed, Meta was made aware of issues with its AI's use of works stolen via BitTorrent. *See*

9  *id.* at ¶53. It strains credulity that Meta would not have engaged in some good faith audit of its

10  practices in data during those disputes.[2] *Cf. Rearden, LLC v. Walt Disney Pictures*, 152 F.4th

11  1058, 1070 (9th Cir. 2025) (noting a magazine article about a disputed copyright may have been

12  enough to for a jury to find defendant "knew or should have known" about vicarious

13  infringement).

14     Second, "vicarious liability does not require actual or even constructive knowledge of

15  infringement." *Rearden*, 152 F.4th at 1071 (citing *Grokster*, 545 U.S. at 930 n.9). Otherwise, the

16  focus would drift from its respondeat superior "roots" in which liability "is premised on the

17  relationship between the defendant and the tortfeasor, rather than the relationship between the

18  _____

19  [1] Meta studiously avoids stating that the forensic evidence failed to actually provide notice of

20  the infringement. That is because that data was extensive and beyond the scope of the pleadings.
   Plaintiffs produced at least fifty representative PCAPS as well as screenshots of their data along

21  with the copyright registration information, info hashes, file names, file hashes, and transaction

22  data for Plaintiffs' works infringed at that time. To the extent that notice is incomplete, it is
   because Meta continued to infringe new works after it was provided. D.E. 1, at ¶¶131, 167.

   [2] Meta claims that "*the Complaint* does not identify what 'evidence' Plaintiffs provided, . . . or

23  how the 'evidence' Plaintiffs provided might have enabled Meta to find the torrenting instances
   they allege." D.E. 34, at 23 (emphasis added). Meta cites to *Waterman v. TikTok, Inc.*, 2024 WL

24  5413655, at *3 (C.D. Cal. Oct. 30, 2024), in which the court dismissed the plaintiff's claim for
   merely pleading that she "complied with DMCA requirements" under 17 U.S.C. § 512(c)(3), a

25  unique copyright regime irrelevant to this matter. Contrary to Meta's argument, *Waterman* held–
   for contributory infringement–that "defendant is not required to be aware of the . . . exact

26  location of the infringing content in order for the knowledge to be specific; it is enough if the
   defendant has *sufficient information* to be able to find the specific infringing content on its

27  system." *Id.* (citation omitted) (emphasis original).

   18

28

defendant and the tort." *Id.* at 1068–69 (collecting cases). Again, the focus is on control. "Meta has the right and ability to supervise and/or control its own corporate IP addresses, as well as the IP addresses hosted in off-infra data centers . . . ." D.E. 1, at ¶169. This is the high-tech equivalent to the ability to patrol the "premises." *See Fonovisa*, 76 F.3d at 262. As *Napster* recognized, the "right to control access to [a communications] system" is "evidence of the right and ability to supervise." 239 F.3d at 1023 (citing *Fonovisa,* 76 F.3d at 262).

Even more damaging, Meta supplied an "AI script" to its agents "to obtain content through BitTorrent," both on and off-sight. *See* D.E. 1, at ¶¶ 101, 115, 169; *see also Amazon.com*, 508 F.3d at 1175 (quoting *Sony*, 464 U.S. at 435 n.17) (noting "the lines between" direct and secondary infringement "are not clearly drawn"). Thus, Meta not only controlled its agents, it developed the script their agents used to infringe the works only to, at best under Defendant's theory, merely "[t]urn a blind eye to detectable acts of infringement[.]" *Napster*, 239 F.3d at 1023 (collecting cases); *Rearden*, 152 F.4th at 1069 (citation omitted) ("[D]efendant, not the copyright owner, bears the burden of affirmatively 'guard[ing] against the infringement.'").

### b.    Meta's Financial Interest in Training Its AI Is Undeniable

Meta also had a direct financial interest in this infringement. "The essential aspect of the . . . inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). Meta evades the issue. It contends that "Plaintiffs failed to plausibly allege . . . that any of Plaintiffs' Works were, in fact, used for AI training at Meta." D.E. 34, at 21. But this is a cramped reading of the Complaint and the legal test. Meta not only directly benefitted by stealing the works and using them to train its AI, it also "*generally*" benefitted by attracting individuals its "services specifically because of the availability of infringing material." *See Robinson v. Binello*, 771 F. Supp. 3d 1114, 1125–26 (N.D. Cal. 2025) (collecting cases) (emphasis original).

Thus, the benefit to Meta is twofold. First, directly, Meta received and stockpiled Plaintiffs' creative works without obtaining a license to train its AI. *See* D.E. 1, at ¶170. Contesting this, Defendant submits a deceptively truncated quote that "'avoidance of licensing fees' is not a direct financial benefit," *see* D.E. 34, at 21, but, more accurately, the Ninth Circuit held that "avoidance of fees *alone*" are insufficient. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 830 (9th Cir. 2019) (emphasis added). Fees Meta charges for its product, built on the infringed works, also qualifies. *See Robinson v. Binello*, 771 F. Supp. 3d 1114, 1126 (N.D. Cal. 2025).

Second, and generally, Meta gained efficiencies—"better download speeds so that it can consume more content, faster," D.E. 1, at ¶112—as well as attendant lower labor costs by "illegally sacrifice[ing] Plaintiffs' copyrights into the swarm for Meta's corporate gain." *Id.* at ¶121. Courts commonly observe that a "[f]inancial benefit exists where the availability of infringing material 'acts as a 'draw' for customers,'" *Napster*, 239 F.3d at 1023 (quoting *Fonovisa*, 76 F.3d at 263–64), and that draw need not "be 'substantial[.]'" *Ellison*, 357 F.3d at 1079. The case presents a variation on this theme.

Instead of drawing literal (paying) customers, Meta made Plaintiffs' works available for others to download and then uploaded them to peers "in order to capitalize on the reciprocal, 'tit-for-tat' mechanism embedded within the BitTorrent Protocol," D.E. 1, at ¶8, that "rewards users who distribute the most desired content." *Id.* at ¶113. Treating Plaintiffs' works as grist for the mill, Meta "enhance[d] the attractiveness," *see Fonovisa*, 76 F.3d at 263, of its IP addresses and increased their speeds and priority in the BitTorrent network. *See* D.E. 1, at ¶¶111, 116–18.

## 2. Meta Is Also Liable for Its Agents' Contributory Infringement

"[C]ontributory liability" is analyzed "in light of 'rules of fault-based liability derived from the common law,' and common law principles establish that intent may be imputed," *Cobbler*, 901 F.3d at 1148) (citations omitted), which "rests . . . on the defendant's relationship to the direct infringement[.]" *See Rams v. Def Jam Recordings, Inc.*, 202 F. Supp. 3d 376, 384 (S.D.N.Y. 2016) (citation omitted); *see also Visa Int'l*, 494 F.3d at 794–95 (noting analog to

20

"enterprise liability and imputed intent"). "To state a claim for contributory infringement, [Plaintiffs] must allege that [Defendant] (1) has knowledge of another's infringement, and (2) materially contributes to or induces that infringement." *Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1487988, at \*3 (N.D. Cal. Mar. 26, 2025) (citation omitted). "Willful blindness of specific facts would establish knowledge for contributory liability." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013) (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003)).

### a. Meta Knew of or Remained Willfully Blind to Thousands of Infringements

The *mens rea* for contributory infringement is not as rigid as Defendant suggests; both active and constructive knowledge make the grade. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098, 1106–07 (N.D. Cal. 2008) (citing *Napster*, 239 F.3d at 1020). Although Meta questions its awareness "of the specific torrents at issue," D.E. 34, at 25, this is no excuse since it "specifically *ordered* that such activity take place." *See UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408, 413–14 (N.D. Cal. 2004) (emphasis original). It cannot invent a general scheme and script to infringe Plaintiffs' works, turn a blind eye to the specifics, and wash its hands of liability. *Cf. Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016) (citation omitted) ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing[.]"). Meta deflects that such infringements "would have [been] kept private," D.E. 34, at 25, even from a sophisticated tech company, but this ignores the fact that BitTorrent is a public protocol and that Plaintiffs' technology caught Meta while only reviewing publicly available data. *See* D.E. 1, at ¶¶56–102.

In line with this scheme, Plaintiffs allege that "Meta knowingly and materially contributes to, encourages, and induces [the direct] infringement[.]" *Id.* at ¶165. That is all the Federal Rules require as "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b). Contrary to Meta's suggestion that *Cobbler* held parties need not "police" their Internet, *see* D.E. 34, at 24, the Ninth Circuit did not extinguish all secondary liability taking place online. Rather,

21

1   it held that the "*bare* allegation that [individuals] failed to police [their] internet service" was

2   insufficient, because it would "effectively create[] an affirmative duty for private internet

3   subscribers to actively monitor their internet service for infringement." 901 F.3d at 1147–49

4   (emphasis added). ). If the rule were otherwise, every resident would be liable *per se* for any

5   visitor's misuse of their Internet connection. Here, by contrast, Meta has known about copyright

6   violations both generally and from Plaintiffs' warnings. It is therefore plausible that Meta either

7   knew or had reason to know about the mass infringements of Plaintiffs' copyrights.

8                                **b.     Meta Materially Contributed to and Encouraged Its
9                                         Agents' Infringement**

10          Meta has also supplied the motive, incentive, and technology to infringe Plaintiffs'

11  works. Again, Plaintiffs need either show that Meta materially contributed to or induced direct

12  infringement. Meta is liable under either theory.

13          Arguing it did not contribute to the infringements, Meta dons the mask of "computer

14  system operation," D.E. 34, at 24, acting as if its agents accessed Meta's technology the same

15  way the public accesses Facebook. But this is not a case in which the defendant has "no direct

16  connection to [the] infringement." *See Visa Int'l*, 494 F.3d at 796. Meta is liable since it

17  "materially contribute[s] to copyright infringement by acting as 'an essential step in the

18  infringement process.'" *Mon Cheri Bridals, LLC v. Cloudflare, Inc.*, 2021 WL 4572015, at *1

19  (N.D. Cal. Oct. 6, 2021) (citations omitted). This can be seen in the algorithm it designed or

20  encouraged that instructed the various IP addresses what materials to download. It also

21  "significantly magnif[ied]" infringement by steering more of its agents to pirate Plaintiffs'

22  works, which in turn drew more peers to pirate Plaintiffs' works, into a continuous cycle of

23  illegal uploads and downloads. *See Amazon.com*, 508 F.3d at 1172. "The Supreme Court has

24  acknowledged that '[t]he argument for imposing indirect liability' is particularly 'powerful'

25  when individuals using the defendant's software could make a huge number of infringing

26  downloads every day." *See id.* (quoting *Grokster,* 545 U.S. at 929). It is of no moment if the

27  infringing material "actually resides on Meta's systems," D.E. 34, at 23, since whether "the

                                                22

28

accused material is actually hosted by the computer system operator is immaterial—merely 'facilitat[ing] access to websites' with infringing material is sufficient for liability under this test." *Miller v. Facebook, Inc.*, 2010 WL 2198204, at *7 (N.D. Cal. May 28, 2010). Facilitating the IP addresses to BitTorrent websites is exactly what the algorithm did.

The Ninth Circuit has also been clear that its "simple [remedial] measures" test applies "[i]n the online context," not the employment context. *See Giganews*, 847 F.3d at 671; *see also Cobbler*, 901 F.3d at 1148 (distinguishing holding as outside the "framework" of its normal contributory jurisprudence "which often involves consumer-facing internet platforms"). Meta supplied its agents with the script to infringe along with the use of and "access to its servers, data centers, IP addresses, computers, networks, accounts, and other tools," *see* D.E. 1 at ¶165, that were used to pirate Plaintiffs' works. This test and the idiosyncratic policies justifying it do not apply to Meta or the facts of the case.

Regardless, there are a host of steps Defendant may have taken. The most obvious would have been to not hire and pay people to pirate works in the first place or develop a script to crawl BitTorrent websites for content. *See id.* at ¶171. Meta's failure to do so, however, was intentional so that it could gain faster downloads under the tit-for-tat mechanics. *See Ellison*, 357 F.3d at 1078 (discussing *Religious Tech. Ctr. v. Netcom Online Communication Servs., Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995)) (noting "inaction" may constitute a material contribution); *see also Luvdarts*, 710 F.3d at 1071–72 (citing *Grokster*, 545 U.S. at 936–37) (noting "failure to implement a digital rights management system may be used as circumstantial evidence"). Meta's failure to take any prophylactic steps is telling.

Nor can it hide behind its novel version of the "curse of bigness," in which Meta is too big to be accountable for its "tens of thousands of employees, contractors, vendors, etc." *See* D.E. 34, at 24. Neither Plaintiffs' claims nor the law require Meta to "[m]onitor[] *every* file downloaded by *any* person" using its equipment. *Id.* (emphasis added). Meta need only cease contributing to the infringement once it has reason to be aware of it. Although Meta claims it

23

had "no control" over "third-party IP addresses," *id.* at 25, this is a questionable fact, *cf. Rearden*, 152 F.4th at 1070 (noting, in the vicarious liability context, that the "ability to supervise this volume of vendors [and third parties] is a quintessential jury question,"), and says nothing about the multitude of other tools supplied to the third-parties used to infringe Plaintiffs' copyrights. Thus, this matter is more like that in *Fonovisa* in which Cherry Auction made available "space, utilities," and other "services" to the third-party infringers. *See* 76 F.3d at 264. "[I]t would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by" Meta. *See id.*; *see also Napster*, 239 F.3d at 1022 (expanding *Fonovisa* to "'the site and facilities' for direct infringement") (citations omitted).

*Sony* is not to the contrary. *See* D.E. 34, at 25. That case concerned "whether the sale of petitioners' copying equipment," Betamax video tape recorders, "to the general public" was a *per se* violation of the authors' copyrights. *See* 464 U.S. at 420. The petitioner sought, *inter alia*, an "injunction against the *manufacture and marketing of Betamax*," *id.* (emphasis added), that is, for simply introducing the device into the stream of commerce. The Supreme Court rejected this overbroad application of copyright and held that Betamax was "capable of substantial noninfringing uses" and that "sale of such equipment to the general public does not constitute contributory infringement[.]" *Id.* at 456. That is not the scenario presented here. *See Napster*, 239 F.3d at 1022 (discussing irrelevance of the "machinery or goods" jurisprudence).

Plaintiffs' claim is not that Meta contributorily infringed their copyrights simply by making technology available to third-parties. Rather, it is that Meta "facilitated the infringement by continuing to pay for and provide the tools for the infringement" when it knew that they were being used to infringe Plaintiffs' copyrights. *See* D.E. 1, at ¶171; *Cobbler*, 901 F.3d at 1148 (quoting *Grokster*, 545 U.S. at 935) ("[T]he limitation of liability in *Sony*—premised on a refusal to impute intent to a defendant based solely on knowledge that a product might be used for infringement—does not apply 'where evidence . . . shows statements or actions directed to promoting infringement.'").

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

Finally, the Complaint states a plausible claim for inducement. "Inducement liability requires evidence of 'active steps . . . taken to encourage direct infringement,' such as 'advertising an infringing use or instructing how to engage in an infringing use.'" *Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 878 (N.D. Cal. 2023) (citations omitted). Meta contends there is "no basis to infer" that Meta "asked or paid" for any infringement. D.E. 34, at 26. But that is the entire tenor of the Complaint. *See* D.E. 1, at ¶¶90–146. There is widespread infringement that traces to Meta's Corporate IPs, Off-Infra IPs, and Residential IP, indicating a corporate policy of piracy. This is bolstered by parallel infringement of others' copyrights in *Kadrey*. *Id.* at ¶¶53–54, 90–92. That Plaintiffs cannot, at this juncture, specifically name individuals responsible for exacting files is immaterial. Plaintiffs have alleged sufficient facts— taken with common sense and favorable inferences, *see Iqbal*, 556 U.S. at 678–79—to state a plausible claim that Meta both directly and indirectly infringed their copyrights.

## V.     CONCLUSION

Meta's Motion fails to show any of Plaintiffs' claims are implausible. To the contrary, Plaintiffs conscientiously outline the relevant facts that explain Meta's behavior in a clear, unembellished manner. What Meta has done–and continues to do–is infringe Plaintiffs' works on a scale Plaintiffs have never seen before. If it is true that AI is itself value neutral, and it could be as much a specter of danger as a herald of growth, then the Copyright Act must provide critical guardrails and balance to steer this technology. Meta's Motion is an attempt to thwart the protections Congress enacted in the Copyright Act. Respectfully, Plaintiffs simply ask for their day in court and ask this Court to deny the Motion.

DATED this 10th day of November, 2025.

Respectfully submitted,

By:     /s/ *Christian Waugh*
Christian W. Waugh (FL SBN 71093) *
WAUGH PLLC
201 E. Pine St., Ste. 315
Orlando, FL 32901

25

OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS
COMPLAINT FOR COPYRIGHT INFRINGEMENT
Case No.: 5:25-cv-06213-EKL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*cwaugh@waugh.legal*
Tel: (321) 800-6008

Trey D. Brown (SBN 314469)
Strike 3 Holdings, LLC
11271 Ventura Blvd., Ste. 717
Studio City, CA 91604
*trey@strike3holdings.com*
Tel: (323) 347-4721

Jeremy J. Thompson (MN SBN 402173) *
Law Office of Jeremy J. Thompson PLLC
5200 Wilson Rd., Ste. 150
Edina, MN 55424
*jeremy@jthompson.law*

Lincoln D. Bandlow, Esq. (CA #170449)
Law Offices of Lincoln Bandlow, PC
1801 Century Park East, Suite 2400
Los Angeles, CA  90067
*Lincoln@BandlowLaw.com*
Tel: (310) 556-9680

*Attorneys for Plaintiffs,*
STRIKE 3 HOLDINGS, LLC and
COUNTERLIFE MEDIA, LLC

26