CLEARY GOTTLIEB STEEN
& HAMILTON LLP
ANGELA L. DUNNING (212047)
adunning@cgsh.com
YE EUN CHARLOTTE CHUN (331459)
chchun@cgsh.com
KIMBERLY BITTINGER (359907)
kbittinger@cgsh.com
1841 Page Mill Rd, Suite 250
Palo Alto, CA 94304
Telephone: +1 (650) 815-4100

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
THOMAS W. YEH (287118)
tyeh@cgsh.com
650 California St., Suite 2400
San Francisco, CA 94108
Telephone: +1 (415) 796-4400

Attorneys for Defendant
META PLATFORMS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| STRIKE 3 HOLDINGS, LLC, a Delaware limited liability company, and COUNTERLIFE MEDIA, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:25-cv-06213-EKL<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>Date: January 21, 2026<br>Time: 10:00 a.m.<br>Ctrm: 7<br><br>Judge: Hon. Eumi K. Lee |

# **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................................. 1

II.  ARGUMENT ........................................................................................................................ 2

    A.   Plaintiffs Fail To Adequately Plead Direct Copyright Infringement ............................ 2

        1.   Plaintiffs do not plausibly plead that Meta trained AI on their Works ......................... 2

        2.   Plaintiffs do not plausibly plead that Meta directed the torrenting ............................. 4

        3.   Plaintiffs Misstate The Volitional Conduct Standard ..................................... 11

    B.   Plaintiffs Fail To Adequately Plead Vicarious Liability ............................................. 11

    C.   Plaintiffs Fail To Adequately Plead Contributory Liability ........................................ 12

III. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) .......................................................................................... 12, 15

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ............................................................................................................ 4, 5

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) .................................................................................................. 8

*Cobbler Nevada, LLC v. Gonzales*,
   901 F.3d 1142 (9th Cir. 2018) ........................................................................................ *passim*

*Erickson Prods., Inc. v. Kast*,
   921 F.3d 822 (9th Cir. 2019) .................................................................................................. 12

*Fonovisa Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) .................................................................................................... 15

*Frenzel v. AliphCom*,
   76 F. Supp. 3d 999 (N.D. Cal. 2014) ........................................................................................ 9

*Headhunter, LLC v. Castillo*,
   2018 WL 333199 (W.D. Wash. Jan. 9, 2018) .......................................................................... 5

*In re Google Generative AI Copyright Litigation*,
   2025 WL 2624885 (N.D. Cal. Sept. 11, 2025) ..................................................................... 1, 2

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   591 F. Supp. 2d 1098 (N.D. Cal. 2008) .................................................................................. 13

*In re Mosaic LLM, Litig.*,
   2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ......................................................................... 2

*Miller v. Facebook Inc.*,
   2010 WL 2198204 (N.D. Cal. May 28, 2010) ....................................................................... 14

*Mon Cheri Bridals, LLC v. Cloudfare, Inc.*,
   2021 WL 4572015 (N.D. Cal. Oct. 6, 2021) .......................................................................... 15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ................................................................................................ 11

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) 668–670 ...................................................................... 11, 12, 14

*Robinson v. Binello*
   F. Supp. 3d 1114 (N.D. Cal. 2025) ......................................................................................... 12

*Sandisk Corp. v. IPValue Mgmt., Inc.*,
   2025 WL 2838945 (N.D. Cal. Oct. 7, 2025) ............................................................................ 8

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
    464 U.S. 417 (1984) .................................................................................................... 15

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................................................ 8

*Strike 3 Holdings, LLC v. Andaya*,
    2021 WL 5123643 (N.D. Cal. Nov. 4, 2021) ............................................................. 3, 5

*Strike 3 Holdings, LLC v. Doe*,
    2022 WL 17178309 (N.D. Cal. Nov. 23, 2022) ............................................................ 6

*Strike 3 Holdings, LLC v. Doe*,
    2024 WL 4467590 (C.D. Cal. Aug. 1, 2024) ................................................................ 5

*Strike 3 Holdings, LLC v. Doe*,
    2025 WL 2309020 (S.D. Cal. July 3, 2025) ................................................................ 11

*Strike 3 Holdings, LLC v. Doe*,
    791 F. Supp. 3d 1102 (N.D. Cal. July 21, 2025) .......................................................... 5

*Strike 3 Holdings, LLC v. Lim*,
    2022 WL 3137937 (N.D. Cal. Mar. 31, 2022) ............................................................ 11

*Strike 3 Holdings, LLC v. Vokoun*,
    2022 WL 310201 (D.N.J. 2022) .................................................................................... 5

*United States v. Mariner Health Care, Inc.*,
    552 F. Supp. 3d 938 (N.D. Cal. 2021) .......................................................................... 8

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ....................................................................................... 11

*Waterman v. TikTok, Inc.*,
    2024 WL 5413655 (C.D. Cal. Oct. 30, 2024) ....................................................... 13, 14

## I. INTRODUCTION[1]

The lynchpin of each of Plaintiffs' copyright claims is their allegation that Meta directed downloads of Plaintiffs' adult videos for AI training. As Plaintiffs recognize, this is essential to their ability to show the volitional conduct required to plead direct infringement by Meta, the financial interest required to plead vicarious liability, and the knowledge necessary to plead contributory liability. But as Meta's Motion demonstrated and Plaintiffs' Opposition now confirms, Plaintiffs have no facts to plausibly establish the central tenet of their claims.

To start, Plaintiffs do not actually assert (nor could they) that any of their Works was used to train any Meta AI model. This defect requires dismissal under *In re Google Generative AI Copyright Litigation*, 2025 WL 2624885 (N.D. Cal. Sept. 11, 2025), but Plaintiffs fail to address it. They also fail to allege that any Meta model has ever allegedly outputted works resembling theirs, or generated adult images or video of any kind. Considering the undisputed fact that Meta *prohibits* use of its AI models to create such content, Plaintiffs' rank speculation that Meta commenced and directed a years-long campaign of torrenting their adult videos for AI training—years before Meta even began researching video models—simply is not plausible.

Many of Plaintiffs' own allegations further belie their theory. The sporadic downloads from 47 Meta IP addresses—a meager 157 total (or an average of 22 per year) spread over seven years—exhibit the hallmarks of personal use and, in any event, are plainly inconsistent with their AI training theory. So are the 97 individual downloads made using the residential IP address of a contractor's *father*, whom Plaintiffs now admit to having sued for that conduct. And they still lack any credible basis whatsoever to link Meta to 2,500 *third-party* IP addresses. The pleaded facts logically point only *away* from Meta and refute the untenable conclusions Plaintiffs ask the Court to draw.

When stripped of unsupported inferences, the only well-pleaded fact arguably connecting Meta to the alleged wrongdoing is that 47 of its corporate IP addresses were used sporadically over seven years to perform a small fraction of the at-issue downloads. This is not enough under *Cobbler*

---

[1] Unless otherwise stated, capitalized terms have the meanings ascribed to them in Meta's Motion and RJN. Citations to "¶" and "Ex." are to the Complaint's paragraphs and exhibits; citations to "Opp." and "RJN Opp." are to Plaintiffs' oppositions to Meta's Motion and RJN, respectively (ECF Nos. 37, 38); all emphases are added, and internal citations and quotation marks are omitted.

to plausibly plead that *Meta* directed, financially benefited from, or even knew about, any downloads of Plaintiffs' Works. The entire Complaint should be dismissed.

## II. ARGUMENT

### A. Plaintiffs Fail To Adequately Plead Direct Copyright Infringement

Plaintiffs concede that a viable claim for copyright infringement requires "something more" than Meta's ownership of the IP addresses purportedly used to download Plaintiffs' Works. Opp. at 7 (citing *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1145 (9th Cir. 2018)). They nevertheless insist they have met this requirement by alleging facts plausibly showing that Meta directed the downloading of those Works for AI training. Opp. at 7–10. Plaintiffs are wrong.

#### 1. Plaintiffs do not plausibly plead that Meta trained AI on their Works

The central premise of Plaintiffs' claims is that Meta directed the download of Plaintiffs' Works via BitTorrent to "acquir[e] content to train its Meta Movie Gen, Large Language Model ('LLaMA'), as well as various other Meta AI Models that rely on video training content." ¶ 7; *see* Opp. at 1 (Plaintiffs seek to "protect their creative works" from "unauthorized use in Meta's AI"); *id.* at 2 ("Meta pirated countless creative works from Plaintiffs … to train its AI"). Yet, as Meta's Motion pointed out (at 12), the Complaint stops short of actually alleging that Meta trained any particular model on any of Plaintiffs' Works. That defect is fatal. Under *In re Google Generative AI Copyright Litig.*—which Plaintiffs do not address—a complaint "fail[s] to plausibly allege copyright infringement" as to AI models where, as here, plaintiffs do "not allege that any of their works were included in training datasets used to develop these models." 2025 WL 2624885, at *4, *7; *see also In re Mosaic LLM, Litig.*, 2025 WL 2402677, at *2–3 (N.D. Cal. Aug. 19, 2025) (same).

Plaintiffs assert that they have done enough because they have "linked the infringement to at least one Meta product" and "presented evidence indicating that Meta's AI trains on adult content" (Opp. at 11 (citing ¶¶ 145, 143)), but neither argument withstands scrutiny. Paragraph 145 of the Complaint alleges that "Meta's AI Movie Gen may very well soon produce full length films with Plaintiffs' identical style and quality," but cites no example of this and carefully avoids alleging that Movie Gen was, in fact, trained on Plaintiffs' Works (or which ones). Indeed, the Complaint alleges that Meta did not "beg[i]n researching" video generation models until 2022 and

did not release Movie Gen until 2024 (¶¶ 41, 45), begging the question of how downloads purportedly dating back to 2018 (*see* Ex. F, Dunning Ex. 5[2]) could have been undertaken for purposes of training that model. Plaintiffs decry this as mere "hairsplitting" and assert that "when Meta actually began constructing its AI hardly excuses the infringements prior to 2022, and certainly does not explain away those that took place after." Opp. at 16. But this misses the point. Plaintiffs' asserted basis for accusing *Meta* of committing these infringements is that Meta wanted Plaintiffs' videos for AI training; if the activity occurred before and independent of any training at Meta, there is no basis to plausibly infer that Meta directed any of it. The far more logical inference is that individuals have used Meta's internet over the years for personal reasons unrelated to Meta.[3]

Plaintiffs' invocation of "evidence" that Meta trains on unspecified "adult content" comes nowhere close to filling this gap. Opp. at 11. The only alleged "evidence" of this is that Meta's chat bots "may have … the capacity for fantasy sex." ¶ 143. But the allegation that certain *text*-based models can engage in sexually explicit roleplay says nothing about whether Meta trained Movie Gen (or any other model) on *Plaintiffs'* adult *videos*. Moreover, the Meta AI Terms of Service expressly prohibit users from attempting to generate or disseminate adult content, making it illogical and implausible that Meta would train its video models on such material. Mot. at 2.[4] While Plaintiffs argue that the Terms raise factual issues about Meta's control over user behavior, this argument sidesteps the key point: Meta's prohibition against generating pornographic content undermines the plausibility of Plaintiffs' assertion that their films were "ideal" or valuable for AI training. Opp. at 2. And unlike in *Strike 3 Holdings, LLC v. Andaya*, 2021 WL 5123643, at *3, *4 (N.D. Cal. Nov. 4, 2021), where *Cobbler's* "something more" requirement was satisfied by "publicly available information indicating a connection between [defendant's] interests" and the allegedly infringing

---

[2] Meta's Motion (at 6 n.3) inadvertently referred to Dunning Ex. 5 as Ex. 12.
[3] Plaintiffs do not attempt to defend the adequacy of their pleading as to other AI models mentioned in passing in the Complaint: SlowFast, Imagebind, Make-A-Video, V-JEPA 2, and LLaMA 4. ¶¶ 39–52. The other alleged project, Ego4D (¶ 40), is not a model—it is a *dataset* and, thus, could not have been "trained on video data" as asserted in the Opposition (at 16) but not the Complaint. *See* Mot. at 4; RJN Reply at 2–3. At a minimum, any claims pertaining to these models must be dismissed.
[4] Plaintiffs' RJN Opp. (at 5) affirmatively relies on a public document showing Meta removed two sexually explicit images posted by users to its platforms as violative of Meta policies against such content, which only proves Meta's point. RJN Reply at 3.

downloads, Opp. at 8, here, the only plausible inference from Meta's public statements is that Meta had no interest in training on Plaintiffs' adult videos and, thus, no reason to download them.

This is further substantiated by the Complaint's failure to identify any instance in which any Meta AI model ever generated adult video, much less images or video resembling Plaintiffs' Works. *See* Mot. at 7. Plaintiffs have no statements, papers, research, news reporting or other direct, contemporaneous evidence, nor even circumstantial evidence in the form of outputs, to support a plausible inference that Meta ever used their Works for AI training.

This should end the analysis. *Ashcroft v. Iqbal* requires the court to "draw on its judicial experience and common sense" when determining whether a complaint states a plausible claim for relief. 556 U.S. 662, 679 (2009). Plaintiffs' allegations throw common sense out the window.

### 2. Plaintiffs do not plausibly plead that Meta directed the torrenting

Unable to plausibly allege that Meta trained its AI models on their Works (the whole reason it supposedly downloaded them), Plaintiffs nevertheless insist that their other allegations, taken together, allow a plausible inference that Meta directed this activity. Plaintiffs are wrong. Piling one unsupported inference upon another does not turn an untenable claim into a plausible one.

***First***, Plaintiffs assert that "at least forty-seven unique Corporate IPs owned by Meta" were used to download 157 of their Works. Opp. at 7; Ex. A. But that is what *Cobbler* found insufficient because an IP address owner who "establish[ed] an account" is not necessarily responsible for the infringement where, as here, "multiple devices and individuals may be able to connect via an IP address." 901 F.3d at 1146; *see id.* at 1145. This is especially so in the case of Meta, whom Plaintiffs acknowledge "[is] one of the largest companies in the world." Opp. at 2. Plaintiffs cannot reasonably dispute that thousands of people access the internet using Meta IP addresses every day for both Meta and non-Meta use. Mot. at 10; RJN Reply at 2. Over seven years, that number would be staggeringly large. As *Cobbler* recognized, although "[i]dentifying an infringer becomes even more difficult in instances like this one, where numerous people … visit a facility that uses the same internet service," that "complication does not change the plaintiff's burden to plead factual allegations that create a reasonable inference that the defendant is the infringer." 901 F.3d at 1146–47. Plaintiffs plead no such facts here. To the contrary, as alleged by Plaintiffs, the 157 downloads

1   occurred piecemeal and sporadically over seven years as one would expect of random individuals
2   downloading video content for personal use and in a manner that does not remotely (or plausibly)
3   suggest coordination by Meta for *any* purpose, much less AI training.

4   Plaintiffs cite several cases for the proposition that they have nevertheless satisfied *Cobbler*,
5   but each is easily distinguished.  In *Andaya*, the court granted a default judgment where plaintiff
6   provided details to trace all alleged infringements to a single residential IP address owned by the
7   defendant resident, as well as facts plausibly eliminating the other residents as likely downloaders,
8   including through evidence from the infringer's social media. 2021 WL 5123643, at *4; *see also*
9   *Strike 3 Holdings, LLC v. Doe*, 2024 WL 4467590, at *2 (C.D. Cal. Aug. 1, 2024) (connecting
10  specific downloads to defendant through his social media); *Strike 3 Holdings, LLC v. Vokoun*, 2022
11  WL 310201, at *3 (D.N.J. 2022) (same); *Strike 3 Holdings, LLC v. Doe*, 791 F. Supp. 3d 1102,
12  1104-5 (N.D. Cal. July 21, 2025) (same).  Likewise, in *Headhunter, LLC v. Castillo*, the plaintiff
13  described the physical location and layout of defendant's residence to show it was "unlikely the IP
14  address was hijacked by someone outside the residence." 2018 WL 333199, at *2 (W.D. Wash.
15  Jan. 9, 2018).  In contrast here, Plaintiffs offer no plausible basis to tie the contents of downloads
16  made using the Meta corporate IP addresses to *anyone*, much less to Meta specifically, as opposed
17  to the countless visitors and third parties who may have accessed its internet over the years.

18  ***Second***, Plaintiffs assert the requisite "something more" can be found in Exhibit G, which
19  they claim "outlines over 1,000 examples of Meta distributing Plaintiffs' movies for at least three
20  full days after acquiring" them.  Opp. at 7–8.  But, as Meta noted (Mot. at 6, 13) and Plaintiffs
21  ignore, Exhibit G does not link that alleged activity to any IP address (Meta or otherwise) or provide
22  any other factual basis to infer that Meta directed it.  Mot. at 6.  Equally unavailing is Plaintiffs'
23  surmise that Meta engaged in this activity to enable faster torrenting of other AI training content.
24  (Opp. at 2, 20, 23.).  Even assuming that is how BitTorrent works, nowhere in their voluminous
25  exhibits do Plaintiffs identify any alleged download that was purportedly enabled or expedited by
26  the alleged instances of distribution.  This is just a speculative theory, without any facts to render
27  it plausible rather than merely possible, as required.  *Iqbal*, 556 U.S. at 678.

28  ***Third***, Plaintiffs argue that "Exhibit B shows Meta infringing nearly 5,000 third-party files

1   consistent with the 'massive amounts' of data required for AI training by Meta." Opp. at 8.  But
2   Exhibit B is an aggregation of alleged downloads of third-party content, the vast majority of which
3   used *third-party* IP addresses, which are even further removed from Meta.  Mot. at 4–6; *see also*
4   *Strike 3 Holdings, LLC v. Doe*, 2022 WL 17178309, at *4 (N.D. Cal. Nov. 23, 2022) (finding
5   "particularly problematic" Strike 3's failed attempt to link alleged infringer to downloads from third-
6   party IP address).  Further, neither the volume nor manner of the alleged torrenting—5,000
7   disparate files (TV shows, photos, newspapers, music) torrented one-at-a-time using 2,500 IP
8   addresses over seven years—remotely suggests AI training.  Indeed, Plaintiffs do not allege that
9   any of this third-party content was actually used, or even useful, for training any Meta AI model.  *See*
10  Mot. at 5.  As with their adult videos, Plaintiffs make no attempt to explain how any of these alleged
11  downloads in Exhibit B supposedly tie to Meta or anything it was purportedly doing at the time.

12  ***Fourth***, Plaintiffs claim that the downloads of *third-party* works alleged in Exhibit B show
13  a connection or coordination between the Meta corporate IP addresses, a residential IP address, and
14  the 2,500 non-Meta IP addresses in Ranges A-G. Opp. at 3.  This is their purported hook to attribute
15  all torrenting activity across the residential and non-Meta IP addresses to Meta and thereby inflate
16  the alleged downloads of *their* Works listed in Exhibit F beyond the 157 allegedly downloaded
17  using Meta corporate IP addresses (which, standing alone, plainly do not plausibly support their AI
18  training theory).  *See* Mot. at 6 (citing ¶¶ 108–09, Exs. E, F).  But this gambit fails at every level.

19  The residential IP address does not belong to Meta or any of its personnel.  By Plaintiffs'
20  own allegations, it belongs to the *father* of a Meta contractor.  ¶¶ 103–06.  Plaintiffs do not allege
21  that the Meta contractor lived with his father or ever used his father's IP address, a point Meta made
22  in its Motion (at 10) and Plaintiffs ignore.  That is, Plaintiffs' allegations are not even sufficient
23  under *Cobbler* to tie the downloads using the residential IP to "the conduct of Meta's contractor"
24  (Opp. at 10), much less that of *Meta*.  And the Opposition reveals a significant new fact—Plaintiffs
25  have already sued the *father* for the very same conduct. Opp. at 9–10; *compare* ¶¶ 103–06 & Exs.
26  B, F *with* Dunning Reply Ex. 9 ¶¶ 4, 48–53 & Ex. A (showing they have sued the father for the
27  same 97 downloads of their Works at issue here).  The lawsuit plausibly explains why there were
28  no further torrents using the father's IP address thereafter and undermines any plausible inference

1   that Meta directed *his* 97 alleged downloads of Plaintiffs' Works for AI training or otherwise.

2   Plaintiffs' insistence that Meta must have directed the torrenting using the 2,500 IP
3   addresses in Ranges A–G is likewise illogical and unsupported. To begin, Plaintiffs assert that all
4   seven of these ranges "trace back to off-sight [*sic*] datacenters," but this contradicts their own
5   allegation in ¶ 99 that Range G is registered to a Hawaiian non-profit. Opp. at 3. Plaintiffs still
6   offer no explanation for why downloads using IP addresses in Range G might be attributed to Meta.

7   As to Ranges A–F, Plaintiffs assert, on information and belief, that these six IP ranges
8   correspond to "six different servers managed by a major third-party datacenter," as "referenced in
9   the *Kadrey* lawsuit." ¶ 98; *see also* Opp. at 4 (arguing that these ranges correspond to "six hidden
10  data centers that were used to engage in massive infringement of both Plaintiffs' and the *Kadrey*
11  plaintiffs' works as well"); Opp. at 7 (asserting that Meta "torrented LibGen and Anna's Archive").
12  Court filings from *Kadrey* cited in the Complaint—which Plaintiffs admit are incorporated by
13  reference (RJN Opp. at 2)—refer to Meta employees torrenting more than a million files from a
14  portion of LibGen in May 2023 (Dunning Ex. 6 at 3, 5), as well as portions of Anna's Archive, an
15  even larger dataset, between April and June of 2024 (Dunning Ex. 7 at 52, 93). If IP Ranges A–F
16  corresponded to the servers Meta allegedly used in *Kadrey* to torrent such a large amount of data,
17  one would expect that activity to be reflected in Exhibits B and C. It is not. Plaintiffs' rank
18  speculation that the third-party IP addresses used to download the works listed in Exhibit B are
19  Meta's alleged "off infra" servers referenced in *Kadrey* is contradicted by their own exhibits, which
20  show none of the activity that Plaintiffs' inference would require.

21  Meta's Motion listed other reasons that the alleged downloads do not plausibly point to the
22  *Kadrey* servers or Meta, but Plaintiffs have no answers to any of them. These include: (a) the
23  activity alleged in *Kadrey*—downloading of large datasets over discrete periods of time in 2023
24  and 2024—bears no similarity to the alleged one-at-a-time, sporadic downloading over seven years
25  of the individual third-party works listed in Exhibit B or Plaintiffs' own Works listed in Exhibit F
26  (Mot. at 14); (b) the alleged downloads began *years* before Meta is alleged to have conducted the
27  torrenting or configured the servers at issue in *Kadrey* (*id.* at 12); (c) Exhibits B and F reflect a
28  hodgepodge of duplicative, haphazard activity indicative of uncoordinated, individual actors (*id.*),

not, as Plaintiffs' argue, a "sophisticated coordinated effort" (Opp. at 13) to gather the "massive amounts" of data required for AI training (¶ 129); and (d) Plaintiffs' theory that Meta took pains to "conceal" the alleged downloads in Exhibits B and F that used third-party IP addresses (¶ 90) while simultaneously using readily identifiable Meta corporate IP addresses for other downloads in those same exhibits, including 157 of Plaintiffs' Works, between 2018 and 2025, simply makes no sense.

There is only one plausible way to harmonize all of the allegations Plaintiffs seek to twist into a claim—these downloads were not directed or coordinated by Meta. Contrary to Plaintiffs' suggestion, this is not an "affirmative defense"; nor is Meta suggesting Plaintiffs must "disprove any alternate or 'innocent' explanation where the … allegations are plausible." Opp. at 10. Rather, dismissal is appropriate because the facts alleged in the Complaint do *not* plausibly allow the chain of unsupported inferences required to establish that Meta downloaded any of Plaintiffs' Works.

The cases cited by Plaintiffs (Opp. at 11–12) to avoid dismissal under the *Iqbal* plausibility standard only serve to show why dismissal is required here. *See, e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1220 (9th Cir. 2011) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss"); *In re Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (affirming dismissal and holding, "To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their [] and defendants' competing explanation[s]"); *Sandisk Corp. v. IPValue Mgmt., Inc.*, 2025 WL 2838945, at *3 (N.D. Cal. Oct. 7, 2025) (allowing patent claim to proceed only because, unlike here, plaintiffs linked the infringement to Sandisk through its engineers and a paper they authored disclosing the infringement). And Plaintiffs' misleadingly cite *United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938, 949 (N.D. Cal. 2021), for the proposition that they "need not rule out obvious alternative explanations." Opp. at 12. In reality, the case explains that, under *Iqbal*, "where a plaintiff's explanation is *possible* rather than plausible, they must allege 'something more,' such as facts 'tending to exclude the possibility that the alternative explanation is true.'" *Id.* (emphasis in original). Indeed, even when a plaintiff has "crossed the line from possibility to plausibility," dismissal should be granted where the defendant offers an "alternative explanation [that] is so convincing as to render [the plaintiff's] explanation implausible." *Id.* Under either formulation of the standard, Plaintiffs' claims against Meta fail.

***Fifth***, unable to eke out a plausible claim from their allegations and exhibits, Plaintiffs improperly inject facts outside their pleading. For instance, Plaintiffs argue that Meta "hir[ed] teams … and suppl[ied] them with scripts to pirate works en masse" (Opp. at 2); "perform[ed] exhaustive, systematic, and hyper-literal searches of strings of data to acquire any file containing even a single key word, even if it is not semantically related to the subject" (*id.* at 4); and "developed, supplied, or encouraged" unidentified persons to use a "universal 'script'" for the alleged downloads (*id.*). *See also* Opp. at 16 (unpleaded assertion that Ego4D and Slowfast were "trained on video data"); *id.* at 18 n.1 (unpleaded facts about supposed notice). None of this is alleged in the Complaint or properly considered in ruling on Meta's Motion. *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'").

Plaintiffs' new "facts" are also implausible on their face. To start, the only "script" identified in the Complaint was one allegedly used in *Kadrey* to "intentionally *limit* distributing popular books on BitTorrent." ¶ 115. In other words, it was not a collection or scraping script; it was designed to *prevent* the upload or "seeding" of works (¶ 118)—the opposite of what Plaintiffs assert Exhibits G, H, and I show. If Plaintiffs are now asserting that Meta wrote a script to find and download their Works by keyword, that is unsupported and contradicts their own Complaint.

Plaintiffs' assertion that Meta "perform[ed] exhaustive, systematic, and hyper-literal searches of strings of data to acquire any file containing even a single keyword" (Opp. at 4) is also unpleaded and unavailing. In support of this new assertion, the Opposition claims Exhibit B shows "several instances of Meta's IP addresses infringing either a near identical file, or a file categorically related to a file" downloaded to an IP address in Ranges A–G or the Residential IP address close in time to one another. *Id.* at 12. These purportedly include multiple alleged downloads of Microsoft Office software, episodes of "Real Housewives of Atlanta" and "My Brilliant Friend," and three files (including a video game and book) with the common word "Origin" in their title, all cited for the first time in Plaintiffs' Opposition (at 12, 13). Plaintiffs argue this shows Meta must have been "[c]rawling the web" for specific words because "[t]here is no meaningful relationship between these works," suggesting "the kind of systematic, hyper-literal search consistent

with an algorithm, and not just a person casually searching for files." *Id.* at 13.  But allegations that the Residential IP address was used to download multiple versions of business software, or that multiple people may have used different IP addresses to download other popular content, does not plausibly show that *Meta* was directing these downloads.  The Complaint does not allege that Meta trained on video games, TV shows, or software or used a "crawler" to find files by keyword, and it strains credulity to suggest that Meta would gather training data in this inefficient, nonsensical way.  If anything, using hyper-literal searching to cherry-pick torrent downloads bearing no "meaningful relationship" to each other appears to be what *Plaintiffs* did to compile Exhibit B, the methodology for which is otherwise unexplained in the Complaint.  *See* Mot. at 10.

Continuing in this vein, Plaintiffs assert that "Meta distributed Plaintiffs' works for extended periods of time across different Corporate IPs."  Opp. at 7.  But the only citation they include for this proposition is Exhibit A at lines 36–37, allegedly "showing the same movie file being torrented across two Corporate IPs between December 27, 2019 and January 6, 2020."  In other words, these lines show two downloads of the movie file, not any distribution (alleged distributions appear in Exhibits G, H, and I, which do not identify any Meta corporate IP addresses).[5]  Moreover, according to Exhibit D (at line 266), this particular movie was first published on December 25, 2019.  These unpleaded allegations thus establish, at most, that two unidentified persons used Meta corporate IP addresses to torrent a new release film within 10 days of each other.  This does not plausibly support Plaintiffs' speculation that Meta directed these or any other alleged torrents for AI training or any other purpose.[6]

---

[5] Plaintiffs also mischaracterize their own allegations when they assert that they traced "well over 100,000 unauthorized distribution[s]" "directly to Meta's offices or to entities associated with Meta." Opp. at 2 (citing ¶ 80).  This paragraph alleges that Plaintiffs "documented … well over 100,000 unauthorized distribution *transactions*," i.e., *pieces* of works sent out (*see* ¶ 63 (alleging that BitTorrent breaks files "down into numerous pieces")), and none of the alleged distributions in Exhibits G, H, or I are alleged to have emanated from Meta corporate IP addresses.

[6] Another third-party work was allegedly torrented four times using four different Meta corporate IP addresses on April 22, 2019.  Ex. A, lns. 28–31.  Exhibit F (which should contain all downloads from Ex. A) also shows four downloads of this work (all at line 1822), but none of the listed IP addresses match, calling into serious question the reliability of the purported data in those exhibits and obscuring, rather than clarifying, what Meta is being accused of.

### 3. Plaintiffs misstate the volitional conduct standard

As explained in Meta's Motion, a claim for direct infringement should be dismissed where the alleged facts do not plausibly establish that defendant's own volitional conduct was "the direct cause of the infringement." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) 668–670 (affirming dismissal). Plaintiffs concede that direct liability requires "proximate causation" (Opp. at 14 (citing *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019))), but then assert that this is satisfied so long as "an actual human was involved." *Id.* (citing *Strike 3 Holdings, LLC v. Doe*, 2025 WL 2309020, at *2 (S.D. Cal. July 3, 2025)). Not so. While a human must be involved in any infringement claim, direct liability will not lie absent facts plausibly establishing that Meta caused the infringement. *See Strike 3 Holdings, LLC v. Lim*, 2022 WL 3137937, at *2 (N.D. Cal. Mar. 31, 2022). Strike 3 fails to plead such facts here. This is not an "explanatory gap[]" that can be cured in discovery (Opp. at 15); it is a bedrock pleading requirement they fail to satisfy.

Because Plaintiffs fail to plausibly tie alleged downloads of their Works to Meta through AI training or otherwise, the allegation that Meta IP addresses were used for such downloads is "'merely consistent with [Meta's] liability, … stop[ping] short of the line between possibility and plausibility of entitlement to relief.'" *Cobbler*, 901 F.3d at 1147 (citing *Iqbal*, 556 U.S. at 678).

### B. Plaintiffs Fail To Adequately Plead Vicarious Liability

Meta explained that Plaintiffs failed to adequately allege the elements of a vicarious infringement claim. Mot. at 15–16. Plaintiffs' Opposition does not show otherwise.

**No requisite control:** The "control" element looks to "defendant's failure to cause a third party to stop its directly infringing activities." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007). Plaintiffs argue that "Meta has the right and ability to supervise and/or control" its own IP addresses and those "hosted in off-infra data centers" and "supplied an 'AI script' to its agents 'to obtain content through BitTorrent.'" Opp. at 19. As discussed above, Plaintiffs do not adequately plead that Meta knew about, or could have stopped, downloads using the Residential or third-party IP addresses. And absent facts to tie the sprinkling of 157 downloads over seven years using Meta IP addresses to Meta personnel (as opposed to visitors, vendors, or other third parties using its internet, which is just as likely), Plaintiffs cannot show Meta controlled the unidentified

people who allegedly conducted those downloads either. Plaintiffs' allegations, therefore, fail to raise a plausible inference that Meta could have stopped any of the alleged direct infringers.

**No requisite financial interest:** Plaintiffs also fail to allege, as they must, that Meta has a "direct financial interest" in the supposed infringement. *Perfect 10*, 847 F.3d at 673; Mot. at 16. Plaintiffs cite *Robinson v. Binello* to argue that Meta "*generally*" benefitted by attracting users to its "services specifically because of the availability of infringing material." Opp. at 19 (citing 771 F. Supp. 3d 1114, 1125–26 (N.D. Cal. 2025)). In *Robinson*, the court found this satisfied because the defendant received "fees that were paid for each upload or download of the specific infringing work." 771 F. Supp. 3d at 1126. Here, Plaintiffs assert that "[f]ees Meta charges for its product" qualify as a direct financial benefit (Opp. at 20), but they make no attempt to tie those fees to the "availability of infringing material," as required. *Robinson*, 771 F. Supp. at 1126. They cannot do so, because Plaintiffs cannot plausibly plead that Meta trained any AI model on their Works.

Plaintiffs next contend that Meta's position—that "'avoidance of licensing fees' is not a direct financial benefit that can support vicarious liability" (Mot. at 16)—is based on a "deceptively truncated" case quote. Opp. at 20. Not so. The full sentence reads: "Thus, Only Websites' avoidance of licensing fees did not confer a direct financial benefit on Kast as a matter of law," confirming Meta's position. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 830-31 (9th Cir. 2019).

Finally, Plaintiffs argue that Meta benefited through "gained efficiencies" such as "better download speeds" and "lower labor costs." Opp. at 20. But they concede that such "efficiencies" are not a "draw for *customers*," which is what courts have recognized as a viable financial benefit that may support a claim for vicarious infringement. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001). Regardless, Plaintiffs also fail to identify any Work for which Meta's alleged infringement purportedly sped up download speeds, reduced labor costs, or made any other download more efficient, leaving this conclusory "financial benefit" entirely unsubstantiated.

    **C.**    **Plaintiffs Fail To Adequately Plead Contributory Liability**

Plaintiffs also fail to plausibly allege a claim for contributory infringement.

**No requisite knowledge or willful blindness:** Plaintiffs' allegation that Meta was aware of the alleged infringement rests on the faulty premise that it "specifically *ordered* that such activity

1    take place" by "invent[ing] a general scheme and script to infringe Plaintiffs' works." Opp. at 21.
2    As discussed, Plaintiffs do not plausibly allege that any downloads were part of a "scheme" by
3    Meta to download its Works for AI training or that Meta created any "script[s]" to infringe those
4    Works.  *See supra* at 9.  Plaintiffs cite *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F.
5    Supp. 2d 1098 (N.D. Cal. 2008), but it is no help to Plaintiffs.  There, the knowledge requirement
6    was met through allegations that defendants expressly acknowledged the alleged infringement.  *Id.*
7    at 1107 (collecting emails and testimony).  Plaintiffs plead no such facts here; any assertion that
8    Meta trained AI models on Plaintiffs' adult videos is factually unsupported.

9          Plaintiffs instead argue that they need only plead the required knowledge "generally" and
10   have done so by alleging that "Meta knowingly and materially contributes to, encourages, and
11   induces [the direct] infringement[.]" Opp. at 21.  But "[t]hreadbare recitals of the elements of a
12   cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

13         Finally, acknowledging that Meta is not required to "police" the internet under *Cobbler*,
14   Opp, at 22, Plaintiffs baldly assert that "Meta has known about copyright violations both generally
15   and from Plaintiffs' warnings." *Id.*  Plaintiffs neither explain what it means for Meta to have known
16   of violations "generally" nor identify any allegation in the Complaint supporting that claim.  And
17   Plaintiffs nowhere address—much less rebut—that their purported "warnings" do not constitute
18   effective notice, as the Complaint failed to plead what their notice consisted of (*see* ¶¶ 131, 167) or
19   that it provided "sufficient information to be able to find the specific infringing content on its
20   system." *Waterman v. TikTok, Inc.*, 2024 WL 5413655, at *3 (C.D. Cal. Oct. 30, 2024).[7]

21         In short, the Complaint does not plausibly establish that Meta was either aware of, or
22   willfully blind to, the alleged infringement of their Works by the unidentified users of 47 Meta IP
23   addresses and more than 2,500 third-party IP addresses.

24         **No material contribution:**  Plaintiffs contend that Meta materially contributed to the
25   alleged infringement through "the algorithm it designed or encouraged that instructed the various

---

27   [7] The unpleaded detail in footnote 1 of the Opposition (at 18) is not properly considered, *Frenzel*,
28   76 F. Supp. 3d at 1009, and would not help Plaintiffs in any event, as that information would not have told Meta where in its vast systems to even begin looking for the purported downloads, if they ever resided there to begin with (which is also not supported by any well-pleaded facts).

IP addresses what materials to download." Opp. at 22. None of this is supported by well-pleaded allegations in the Complaint, s*ee supra* at 10, so it cannot support their material contribution theory.

That Meta provided "access to its servers, data centers, IP addresses, computers, networks, accounts, and other tools" (¶ 165)—which is simply to say that it provided employees, contractors, and visitors with internet access—is also insufficient. Plaintiffs must satisfy the governing standard and plausibly allege that Meta "'ha[d] actual knowledge that specific infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works yet continues to provide access to [them].'" *Waterman*, 2024 WL 5413655, at *4 (quoting *Giganews*, 847 F.3d at 671). Plaintiffs disregard this by asserting that the "simple measure" test is inapplicable in the "employment" as opposed to "online" context, Opp. at 23, but they cite no case holding that. *Cf. Giganews*, 847 F.3d at 671 (dismissing contributory infringement claims where, as here, plaintiff failed to adequately plead that defendant—the operator of a platform that allowed users to post and exchange messages—could have taken "simple measures to prevent further damage to copyrighted works"). Moreover, Plaintiffs have not pleaded facts here to plausibly tie the alleged infringement to any Meta employee, so the distinction is no help to them either way.

As noted in Meta's Motion, the Complaint fails to identify any simple measures Meta could have taken to prevent the alleged infringement short of cutting off internet access or monitoring every file downloaded by any person using Meta's global network. Mot. at 24. That runs afoul of *Cobbler*. *See* 901 F.3d at 1148–49 (alleged failure to "secure, police, and protect" an internet connection from infringement fails to state a plausible claim). Indeed, the minimal downloads of Plaintiffs' Works using Meta IP addresses—an average of 22 per year—only underscore how untenable that proposition is, given that thousands of people use Meta's internet every day. Further, the vast majority of Plaintiffs' claims rest on downloads from third-party IP addresses over which Meta has no control, negating the existence of simple (or any) measures Meta could have taken to avoid the infringement. This case is nothing like *Miller v. Facebook Inc.*, where Facebook could have taken the simple step of disabling a specific account or removing a specifically identified game from the "Facebook Application Directory." 2010 WL 2198204, at *7 (N.D. Cal. May 28, 2010).

Plaintiffs' attempt to analogize the facts here to *Fonovisa* and *Napster* fails as well. In *Fonovisa Inc. v. Cherry Auction, Inc.*, the defendant "actively strive[d] to provide the environment and the market for counterfeit recording sales to thrive," 76 F.3d 259, 264 (9th Cir. 1996), and in *Napster* defendant provided an "integrated service designed to enable users to locate and download MP3 music files," 239 F.3d at 1022. The facts in those cases are a far cry from Meta's provisioning of internet access, the only purported contribution plausibly alleged in the Complaint. Moreover, *Mon Cheri Bridals, LLC v. Cloudflare, Inc.* supports Meta, not Plaintiffs. There, the Court found that the defendants' services were not an "essential step in the infringement" and "[f]rom the perspective of a user accessing the infringing websites," the services provided by the defendant "make no difference." 2021 WL 4572015, at *2 (N.D. Cal. Oct. 6, 2021). Here, too, the identity of the internet provider "makes no difference" to users downloading adult content for personal use.

Finally, Plaintiffs do not dispute that "liability for another's infringement cannot arise from the mere distribution of a product that is 'widely used for legitimate, [non-infringing] purposes.'" *Cobbler*, 901 F.3d at 1148 (citing *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 442 (1984)). This forecloses Plaintiffs' material contribution claim, as the Ninth Circuit has already found that a company's providing internet access to employees and visitors cannot support a claim for contributory liability. *Id.* at 1149 (affirming the dismissal of contributory infringement claim and reasoning: "Providing internet access can hardly be said to be distributing a product or service that is not 'capable of substantial' or 'commercially significant noninfringing uses'").

**No inducement:** Plaintiffs assert that their inducement theory is adequately pleaded by repeating the assertion that "[t]here is widespread infringement that traces to Meta's Corporate IPs, Off-Infra IPs, and Residential IP, indicating a corporate policy of piracy." Opp. at 25. As discussed, Plaintiffs have not adequately pleaded such facts, and its inducement theory therefore fails.

### III. CONCLUSION

The claims against Meta for direct, vicarious, and contributory copyright liability are implausible, unsupported, and in conflict with Plaintiffs' own pleaded facts. As such, the entire Complaint should be dismissed with prejudice.

Dated: November 20, 2025           CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Angela L. Dunning
Angela L. Dunning

Attorneys for Defendant
META PLATFORMS, INC.